COMMONWEALTH vs. ANTHONY J. JACKSON.

Suffolk. September 14, 1981. — November 13, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Evidence*, Other offense, Prior conviction, Hearsay, Judicial discretion. *Practice, Criminal*, Opening statement by prosecutor, Sequestration of witnesses, Speedy trial, Capital case. *Constitutional Law*, Speedy trial. *Search and Seizure*, Consent, Standing to object.

At a criminal trial, the defendant's entire statement admitting to the crime for which he was on trial, and to several unrelated crimes, was properly admitted in evidence where omission of the references to the other crimes would have rendered his statements unintelligible and where the potential for prejudice to the defendant was reduced by his earlier introduction of evidence implicating him in an unrelated murder. [577-578]

At a criminal trial, newspaper articles referring to certain unsolved crimes were properly admitted in evidence where the articles established the context in which the defendant admitted to the crime charged. [578-579]

At a murder trial, the judge did not err in ruling that, if the defendant were to testify, he would admit evidence of the defendant's prior conviction of assault with a deadly weapon, which resulted from an incident in which the defendant exchanged gunfire with police officers who had followed his automobile. [579-580]

There was no error in a judge's denial of a defendant's motion for a mistrial on the basis that the prosecutor referred in his opening statement to the testimony of two prospective witnesses who subsequently did not testify, where the prosecutor intended to call both witnesses and had not acted in bad faith and where the missing witnesses' testimony would have been merely cumulative of other evidence. [580-581]

At a criminal trial, the judge, who had ordered witnesses sequestered, did not err in permitting two prosecution witnesses, a police officer and an expert witness, to remain in the courtroom after they had testified or in later permitting the police officer to resume the witness stand. [581-582]

A defendant was not unconstitutionally deprived of his right to a speedy trial because of a fifty-seven months' delay between the indictment and trial where the delay was caused by the defendant's own actions. [582-583]

At a hearing on a defendant's motion to suppress evidence seized from an apartment where the defendant had lived prior to his arrest and incarceration on a murder charge, there was sufficient evidence to warrant the judge's findings that the defendant had abandoned the premises and that the police had obtained the landlord's valid consent to a search thereof. [583-584]

After a witness at a murder trial had testified that he had been granted immunity from prosecution for being an accessory after the fact to any murder in which the defendant was implicated and for larceny of a motor vehicle and had been cross-examined on the immunity grants, the judge did not err in permitting the prosecutor to elicit the facts underlying the grants of immunity. [584-585]

At a murder trial, the judge did not err in permitting a police officer to testify to an explanation given him by the person who had discovered the victim's body as to his presence at the place of discovery where the defendant had raised the issue of that person's statements and where the judge instructed the jury that the officer's testimony was to be considered only on the issue of why the police did not suspect that person of murdering the victim. [585]

INDICTMENT found and returned in the Superior Court on April 11, 1973.

A motion to suppress was heard by *Smith,* J., and the case was tried before *Brogna,* J.

*J. Russell Hodgdon & John F. Palmer* for the defendant.

*Philip T. Beauchesne,* Assistant District Attorney (*Alvan Brody,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.  The defendant was convicted by a Superior Court jury of murder in the first degree and sentenced to life imprisonment, to be served from and after any other previously imposed sentence he was serving or was to serve.

The defendant appeals, asserting error in (1) the admission of evidence of other crimes he committed, (2) the trial judge's advisory ruling that he would admit evidence of the defendant's prior conviction, (3) the prosecutor's opening statement, (4) the partial violation of an order sequestering witnesses, (5) the denial of a speedy trial, (6) the denial of a motion to suppress certain physical evidence, and (7) the admission of certain other evidence during trial. The defend-

ant has also asked this court to exercise its broad power of review under G. L. c. 278, § 33E, and order a new trial. We find no reversible error and see no reason to order a new trial. Accordingly, we affirm.

We summarize briefly the pertinent facts, reserving elaboration of specific facts to the discussion of each of the defendant's contentions.

The body of Ellen Ann Reich, age nineteen, was found on November 13, 1972, in a closet in an abandoned apartment at 132 Seaver Street, Roxbury. Reich had lived at 31 Massachusetts Avenue in Boston. She was last seen on Thursday morning, November 8, 1972, by her roommate, Eileen Wacks. Wacks testified that the victim usually hitchhiked to Emerson College, where she attended school. One Belin McArthur found the body while helping a friend, Mary Lee Cobb, move furniture from her apartment at 132 Seaver Street. While waiting for the moving truck to return, he looked around the building and saw a nailed closet door, became curious, and pried it open. The victim's body was inside.

Dr. George W. Curtis, medical examiner for Suffolk County, performed an autopsy on the body on November 14, 1972. This autopsy, in combination with a later exhumation and second autopsy, established that the victim was killed by strangulation and two gunshot wounds to the chest and abdomen. One bullet was retrieved from near the victim's vertebrae, and sperm was found in the victim's vagina.

Human hairs were found on the panties and jeans of the victim, who was white. The hair found on the victim's jeans was determined to be negroid pubic hair, but it did not match the pubic hair of the defendant, who is black. The head hairs found on the victim's panties were negroid in origin, and an expert in microscopic examinations testified for the Commonwealth that he compared them to hair samples of the defendant and found those samples to be microscopically alike in all identifiable characteristics.

Robert P. Spalding, special agent for the FBI in forensic serology, testified that he examined stains in the crotch area

of the victim's jeans and found the presence of factors from blood types "A" and "B," factors which appear when an individual is a "secretor." He stated that a secretor has substances in his or her other bodily fluids which indicate that person's blood type, eighty per cent of the population are secretors, and forty per cent of the population have type "A" blood.

William A. Gavin, also a special agent for the FBI, had studied a sample of the defendant's saliva, and found that he was a secretor, and had type "A" blood. He also found type "B" blood on the victim's sweater, jacket, and slacks. The victim had type "B" blood. Evidence of male spermatozoa was discovered in the victim's panties, together with traces of both "A" and "B" blood type factors. The results of his examination were consistent with the involvement of a female secretor with type "B" blood and a male secretor with type "A" blood. They were also consistent with fluids from one individual having group "AB" blood. Such individuals comprise about five per cent of the population.

William Tobin, a special agent for the FBI in metallurgy, compared nails taken from the frame of the closet where the body was found with nails from a milk carton taken from the defendant's residence at 154 Washington Street, Dorchester. He found hundreds of similarities between the samples, and concluded that the nails originated from the same source.

Several Cambridge police officers testified, over the defendant's objections and exceptions, that they pursued, exchanged gunfire with, and arrested the defendant in Cambridge on the evening of December 26, 1972. Officer John Conroy related that at about eight o'clock that evening he was on cruiser patrol in Cambridge, when he observed the defendant in a dark-colored Cadillac automobile motioning to a young woman walking down the street. He followed the defendant's car until the defendant suddenly "took off" at a high rate of speed. Cambridge police Officer Joseph J. McSweeney soon thereafter spotted the vehicle, which was empty, and located the defendant. He walked toward the defendant, who drew a

gun from a black holster, shot at the officer, and kept firing at him while running down the street. McSweeney returned the fire, and saw the defendant drop to one knee. He lost the defendant for two to three minutes, but found him again, lying on the ground with two police officers beside him. The police looked for a gun, but did not find one. Several days later, a man who worked near the spot where the defendant was apprehended discovered a pearl-handled, silver-colored gun in a snowbank. This gun was turned over to the police. Test bullets fired from this gun were matched microscopically to a bullet retrieved from a building at the site of the Cambridge shooting incident and to the bullet retrieved from the victim's body. Ballistics experts concluded that all of the bullets came from the same gun.

Patricia Archer testified that she had lived with the defendant at 154 Washington Street from the fall of 1972 until the time of his arrest. She identified a holster and the nickel-plated revolver recovered from the snowbank as belonging to the defendant. She also identified the carton containing nails found in the defendant's apartment as the defendant's and testified that she had seen it in the trunk of the defendant's car. Archer also testified that she had visited 132 Seaver Street once with the defendant.

Michelle Maupin, another woman living with the defendant on Washington Street at the time of the defendant's arrest, testified that she had known the defendant for many years. She had seen the defendant carrying a silver gun with a pearl handle, which he carried in a black holster. She, too, saw the carton of nails at the Washington Street address, and visited 132 Seaver Street with the defendant at least nine times.

Maupin visited the defendant at a hospital the morning after he was shot, but he told her to leave so that she would not be questioned by the police. She returned to the hospital the next day, and the defendant asked her to pick up a gun in the snowbank in Cambridge. He drew a map with her eyebrow pencil to locate the weapon.

Donald McDonald, a longtime friend of the defendant, testified over the defendant's objection that he visited the defendant at the Billerica house of correction following his arrest. On February 6 or 7, 1973, McDonald discussed with the defendant two newspaper articles concerning an investigation into the murders of six young women, one of whom was the victim, Reich. These articles referred to a murder in New Hampshire, and McDonald testified that the defendant voluntarily told him that "the one in New Hampshire was not [the defendant's]." The two newspaper articles, with some portions excised, were admitted in evidence. McDonald also testified that the defendant asked him to retrieve the gun abandoned in Cambridge, and that he had seen the defendant with a pearl-handled, silver-colored gun.

1. *Evidence of the defendant's other crimes.* The defendant's primary contention on appeal is that the trial judge committed reversible error when he admitted in evidence the defendant's admission to McDonald and the two related newspaper articles. This evidence, the defendant contends, tied him to the well-publicized murders of other young, white women, creating a serious danger that the jury's decision was based on the defendant's criminal propensity rather than on the evidence.

The statement by the defendant to McDonald ("The one they found in New Hampshire . . . [t]hat wasn't mine") was, in the context of his conversation with McDonald, an indivisible admission of the murders of five young women, including Ellen Reich. The admission is obviously relevant to the issue of who murdered Reich, but it also constitutes evidence of the defendant's participation in the murders of other women. McDonald's statements and the defendant's reply were admissible as an admission by the defendant that he killed Reich. See *Commonwealth* v. *Kenney*, 12 Met. 235, 237 (1847). Evidence that is otherwise relevant to the offense charged is not rendered inadmissible simply because it tends to prove the commission of other crimes. E.g., *Commonwealth* v. *Hoffer*, 375 Mass. 369, 373 (1973).

However, where evidence of other crimes is irrelevant to proof of the offense charged, this court has generally considered it inadmissible, even when that evidence is the defendant's voluntary admission. *Commonwealth* v. *Welcome*, 348 Mass. 68, 70-71 (1964). *Commonwealth* v. *Valcourt*, 333 Mass. 706, 717-718 (1956). *Commonwealth* v. *Bishop*, 296 Mass. 459, 461-462 (1937). *Commonwealth* v. *Kosior*, 280 Mass. 418, 423 (1932). In this case, however, the potential for unfair prejudice to the defendant was reduced by his earlier introduction of evidence implicating him in another, unconnected murder. We conclude that, because the defendant, in his admission of the crime charged, admitted to other, unrelated crimes in a manner that rendered the admission unintelligible if references to the unrelated crimes were omitted, the entire admission was properly admitted in evidence. This conclusion accords with the reasoning in other jurisdictions. See, e.g., *United States* v. *Wiggins*, 509 F.2d 454, 462 (D.C. Cir. 1975) (dictum); *State* v. *Palko*, 122 Conn. 529, 536, aff'd on other grounds, *Palko* v. *Connecticut*, 302 U.S. 319 (1937); *State* v. *Underwood*, 75 Mo. 230, 236 (1881). Cf. *State* v. *Hopkins*, 117 Ohio App. 48, 52 (1962) (confession to setting at least thirty-five fires, including that for which arson was charged, properly admitted); *Commonwealth* v. *Weston*, 297 Pa. 382, 389 (1929) (confession that it was not the first time defendant had "done a thing of this kind" properly admitted). The decision to admit or exclude such an admission requires the trial judge to balance the probative value and the prejudicial impact of the admission, and so it is within his sound discretion. We cannot say that that discretion was abused here.

The admission of the newspaper articles was also within the judge's discretion. The defendant's critical statement was in response to the contents of those articles,[1] as presented

---

[1] On voir dire, McDonald expressed some confusion about which newspaper articles were actually discussed during his conversation with the defendant. It is clear, however, that the defendant was responding to

to him by McDonald. The articles therefore amounted to a declaration, admissible "because it may give meaning and effect to the reply." *Commonwealth* v. *Kenney*, 12 Met. 235, 237 (1847). That is, they established the context in which the admission was made. See *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 78 (1978).

A trial judge should exercise caution in admitting such prejudicial material[2] in evidence for explanatory purposes. The judge here demonstrated appropriate caution by excising irrelevant portions and by giving a careful, forceful instruction to the jurors, limiting their consideration of the remainder of the articles. We presume, as we must, that a jury understands and follows limiting instructions, *Commonwealth* v. *Leno*, 374 Mass. 716, 719 (1978); and their use usually renders any error in the introduction of prejudicial evidence harmless, *Commonwealth* v. *Roberts*, 378 Mass. 116, 127 (1979).

The defendant also asserts as error the admission of other evidence showing various facts[3] that connected him with the other murders. Some of this evidence was introduced for the first time by the defendant, and the balance was so remotely related in time and effect to McDonald's testimony that there was no risk of unfair prejudice to the defendant.

2. *Defendant's prior convictions.* The defendant requested and received an advisory ruling by the judge on the admissibility of his prior convictions should he testify. The judge told the defendant that he would exclude his conviction for murder, but would admit the conviction for assault

---

newspaper articles with the same content as those introduced at trial, and the witness testified that his conversation with the defendant concerned the two articles admitted in evidence.

[2] The articles did not refer to the defendant by name, but did indicate that several of the victims were college students and were last seen hitchhiking, and that a single person was responsible. One also said a suspect was being held in the Billerica house of correction, where the defendant was incarcerated at the time.

[3] Evidence was admitted tending to show that the victim was last seen hitchhiking, that the defendant was arrested after accosting a young girl, and that the defendant was under investigation in other counties.

with a deadly weapon that resulted from the shooting incident in Cambridge. The defendant did not take the stand. The defendant contends that this ruling impermissibly infringed his right to testify on his own behalf and so denied his constitutional right to a fair trial. Article 12 of the Declaration of Rights of the Constitution of the Commonwealth.

The record of some prior convictions of a defendant is admissible to impeach the defendant if he testifies. G. L. c. 233, § 21. We have previously indicated that a trial judge has a right to exclude prior convictions in order to prevent unfairness to a defendant, particularly where they are similar to the crime charged and do not inherently pertain to the defendant's credibility. *Commonwealth* v. *Chase*, 372 Mass. 736, 750 (1977). We have also held, however, that, where the judge admits proof of prior convictions, any prejudice to the defendant is not of constitutional dimension and will not be reviewed on appeal. *Commonwealth* v. *Leno, supra* at 717-718. See *Commonwealth* v. *Diaz*, 383 Mass. 73 (1981); *Commonwealth* v. *Tabor*, 376 Mass. 811 (1978). Thus the defendant's argument fails. It is true also that the events underlying the conviction which was ruled admissible by the judge were closely related to the murder of Ellen Reich. One of the bullets the defendant fired at the Cambridge police officers and his possession of the pearl-handled, silver-colored pistol connected the defendant with the murder weapon. Finally, the defendant's flight from and shooting at the police revealed his consciousness of guilt. This evidence was properly admitted long before the defendant's request for the advisory ruling. Proof of the conviction would be merely cumulative, and for that additional reason no error is shown.

3. *Prosecutor's opening statement.* The prosecutor, in his opening statement, told the jury that two witnesses, Mary McIntyre and Linda White, would testify at trial. He indicated that these two would further link the defendant to 132 Seaver Street, McIntyre to testify that the defendant occupied an apartment there and White to testify that the

defendant had a telephone installed there. Neither witness was produced at trial, despite the prosecutor's efforts to produce them, and the prosecutor justified the omission by indicating that McIntyre's testimony would be cumulative and that White was suffering emotional problems. The defendant's motion for a mistrial on this ground was denied.

There was no error in the judge's denial of the defendant's motion for a mistrial. The prosecution fully intended to call both witnesses at the time of the opening, and therefore could properly comment on the substance of their testimony. Cf. *Commonwealth* v. *Fazio*, 375 Mass. 451, 454-457 (1978) (proper to comment on testimony of witness despite pretrial assertion by counsel that witness would invoke privilege against self-incrimination). There is no evidence that the prosecutor here acted intentionally or in bad faith, cf. *Commonwealth* v. *Killelea*, 370 Mass. 638, 648 (1976), and the cumulative nature of the missing witnesses' testimony makes the omission harmless, cf. *Commonwealth* v. *Roberts*, 378 Mass. 116, 123-124 (1979).

We also note in passing that any potential prejudice to the defendant was reduced by the prosecutor's opening remark that his statements were not evidence, cf. *Commonwealth* v. *Breese*, 381 Mass. 13, 15 (1980), and by the defendant's use in closing argument of the failure of McIntyre and White to testify.

4. *Sequestration order.* The judge, pursuant to a motion by the defendant, issued an order sequestering all witnesses (with certain immaterial exceptions). The judge permitted two witnesses who had testified for the prosecution to remain in the courtroom during the trial. The first, State police Officer McGuinness, resumed the witness stand to reinforce a link in the chain of custody of test bullets fired from the murder weapon. The second, FBI Agent Tobin, was permitted over the defendant's objection to remain in the courtroom to assist the prosecution in its cross-examination of the defendant's nail expert.

The sequestration of witnesses lies within the discretion of the trial judge, and it is not error to refuse to sequester wit-

nesses. *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 748-749 (1975). *Commonwealth* v. *Blackburn*, 354 Mass. 200, 205 (1968). See *Commonwealth* v. *Watkins*, 373 Mass. 849, 850-851 (1977). It is also within the judge's discretion to admit or exclude the testimony of witnesses who have violated sequestration orders. *Commonwealth* v. *Crowley*, 168 Mass. 121, 127-128 (1897) (defense witness's testimony properly excluded). *Commonwealth* v. *Hall*, 4 Allen 305, 306 (1862) (witnesses violating order properly permitted to testify).

The judge here acted within his discretion. The expert witness, Tobin, was not recalled to the witness stand and therefore could not commit perjury, which is the principal evil that sequestration orders are designed to prevent. See W.B. Leach & P.J. Liacos, Massachusetts Evidence 78 (4th ed. 1967). Moreover, the very nature of expert testimony makes perjury unlikely, and so it would be proper to exempt all expert witnesses from a sequestration order. See *Commonwealth* v. *Hersey*, 2 Allen 173, 176 (1861). The testimony of the police officer who resumed the stand was brief, cumulative, and directed only at a technical link in the chain of custody. There was no substantial danger of perjury, and any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Watkins, supra.* See also *Commonwealth* v. *Parry*, 1 Mass. App. Ct. 730, 735-736 (1974).

5. *Speedy trial.* The defendant was indicted on April 11, 1973, and the trial began on January 10, 1978. The defendant contends that this delay of fifty-seven months deprived him of his right to a speedy trial and prejudiced his defense.

This is the second time this court has considered the delay in bringing this case to trial. In *Jackson* v. *Commonwealth*, 370 Mass. 855, 856 (1976), we confirmed a special master's finding that the first three years of delay were attributable to the actions of the defendant, primarily his failure to accept and work with a series of defense attorneys assigned to assist him. We reaffirm that conclusion, and note that the period of time between our previous opinion and this trial was largely consumed by the trial of three other indictments

against the defendant. The balance was taken up with further difficulties between the defendant and yet another defense attorney. The defendant's own actions delayed the trial of this case, and he therefore suffered no deprivation of his right to a speedy trial.

6. *Motion to suppress nails.* On January 19, 1973, without a warrant, the police seized from the defendant's apartment at 154 Washington Street, a milk carton containing, among other things, the nails that were matched to those in the frame of the closet where the body was found. The defendant's motion to suppress these nails was denied on the grounds that the defendant had abandoned the premises, that the police had obtained valid consent to be on the premises, and that the defendant lacked standing to contest the search and seizure.

The hearing judge entered subsidiary findings, none of which is contested on appeal. The defendant had paid rent on the apartment through January 1, 1973. He was arrested on December 26, 1972, placed in custody, and the following day told the other residents of the apartment to move out, and remove all of his belongings and furnishings. The apartment was bare after January 9, 1973. The police were given permission by the landlord to enter the apartment at any time, and the nails were found in a pantry while a policeman was helping Archer, an occupant of the apartment, remove her belongings. The defendant contends that these findings are consistent with a three-week lapse in rental payments due to his incarceration and a desire to protect his belongings.

Even if the defendant's testimony was believed by the hearing judge, the protection of one's belongings is not inconsistent with an intent to abandon the premises. The hearing judge's subsidiary findings are supported by the evidence. Based on our independent review of the application of those findings, e.g., *Commonwealth* v. *Murphy*, 362 Mass. 542, 550-551 (1972) (Hennessey, J., concurring), we affirm the hearing judge's conclusion that the defendant intentionally abandoned any proprietary interest in the prem-

ises. Abandonment leaves the defendant without standing to contest the search and seizure since he has no interest in the property. *Brown* v. *United States*, 411 U.S. 223, 229-230 (1973). See *United States* v. *Salvucci*, 448 U.S. 83 (1980); *Rakas* v. *Illinois*, 439 U.S. 128 (1978). It also renders the warrantless search, made with the landlord's permission, reasonable. See *United States* v. *Wilson*, 472 F.2d 901, 902-903 (9th Cir. 1973). Moreover, any proprietary interest the defendant may have retained in the apartment was shared with Archer, whose consent rendered the seizure valid. *United States* v. *Matlock*, 415 U.S. 164, 171 (1974).

7. *Admission of other evidence*. Testimony was admitted, over the defendant's objection, relating the acts for which the witness McDonald was granted immunity and McArthur's explanation[4] to the police of his presence in the apartment where he discovered the body. In the context of this trial, admission of this testimony was within the sound discretion of the trial judge. The trial judge did not abuse that discretion.

McDonald testified that he was granted immunity from prosecution for being an accessory after the fact to any murder in which the defendant was implicated, and for larceny of a motor vehicle. The defendant, whose questions implied McDonald was involved in several other murders including that of Reich, cross-examined McDonald on these grants of immunity. The prosecutor was permitted, during the subsequent redirect examination, to elicit the facts underlying the two grants of immunity.

Admission of this testimony was within the power of the trial judge to control the scope of direct and cross-examination. See *Commonwealth* v. *Best*, 381 Mass. 472, 488-491 (1980); *Commonwealth* v. *Adrey*, 376 Mass. 747, 752-753 (1978). It was admissible to correct any mistaken conclusions the jury may have drawn from the defendant's questions as well as to rehabilitate the witness. Cf. *Commonwealth* v. *Howard*, 8 Mass. App. Ct. 318, 321-323 (1979). There was no possibility of unfair prejudice to the

---

[4] McArthur was not located and did not testify at trial.

defendant since the defendant had previously brought out testimony linking the defendant to the primary murder in question.

The defendant, in his cross-examination of two witnesses, emphasized that McArthur's presence in the fourth floor apartment where he found the body was suspicious since he was helping a woman move from the third floor. This theory culminated in a colloquy with Officer Madden,[5] who had spoken with McArthur. In response to this colloquy, the trial judge permitted the prosecutor to elicit on redirect examination McArthur's explanation to Officer Madden of his presence on the fourth floor, instructing the jury that this testimony was to be considered only on the issue of why the police did not suspect McArthur.

This testimony was admissible for this limited purpose, and as to that purpose was not hearsay. Cf. *Commonwealth* v. *Miller*, 361 Mass. 644, 658-659 (1972) (testimony that drug users had mentioned the defendant's name admissible to show reason for undercover activity against the defendant). It was relevant to rebut the defense's theory that McArthur was in fact the murderer and that the police had handled the investigation carelessly. Cf. *Commonwealth* v. *Howard, supra.* In addition, the defendant's final question opened up the issue of McArthur's statements, entitling the prosecution to have the entire conversation in evidence. *Commonwealth* v. *Taylor*, 327 Mass. 641, 648 (1951).

8. *Review under G. L. c. 278, § 33E.* The defendant has asked us to grant him a new trial pursuant to our powers under G. L. c. 278, § 33E. Consistent with our duties under that statute, we have reviewed the entire record on the law and the evidence and conclude that the defendant is entitled to no relief under § 33E.

*Judgment affirmed.*

---

[5] COUNSEL FOR THE DEFENDANT: "Is it usual for a person to be moving from the second [*sic* — third] floor to go up to the fourth floor in somebody else's apartment? You didn't find that strange or a little suspect?"

THE WITNESS: "Not when it was explained to me, it wasn't."

COUNSEL FOR THE DEFENDANT: "And he explained it to you did he not?"

THE WITNESS: "Oh yes."