## COMMONWEALTH vs. ANTHONY J. JACKSON.

Middlesex.  February 6, 1984. — May 1, 1984.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Criminal,* Conduct of prosecutor, Dismissal, Examination of jurors, Fair trial. *Jury and Jurors. Evidence,* Other offense, Flight, Relevancy and materiality, Telephone conversation.

Publication of a political advertisement promoting the reelection campaign of an incumbent district attorney and referring to the "hitchhike murderer," although ill-advised, did not impair or potentially impair the fair trial rights of a defendant charged with crimes mentioned in the advertisement so as to necessitate dismissal of the indictments against him. [753-755]

In the circumstances of a murder case, including careful questioning of prospective jurors by the judge to determine whether any juror had prior knowledge of the case, there was no indication that the defendant was denied a fair trial because of pretrial publicity. [755-756]

The judge in a criminal case, after extensive questioning of six jurors who, in response to an inquiry by the judge, had expressed some disposition to give greater credit to police testimony than to that of a civilian witness, did not abuse his discretion in refusing to excuse these jurors for cause where each had subsequently indicated that he or she could follow instructions to consider the evidence impartially. [756-757]

The judge at a murder trial did not abuse his discretion in admitting in evidence a witness's testimony about a conversation he had had with the defendant regarding a newspaper article containing pictures of six murdered women, where there was additional testimony from which the jury could infer that both the witness and the defendant were referring to the same article, even though the article was not before them during the conversation. [757-758]

A judge's decision to admit evidence, at the defendant's trial for murder, of a chase and shoot-out with the police preceding his arrest, as relevant to show the defendant's consciousness of guilt, was not palpably unreasonable, although the arrest occurred about one month after the victim's murder and following the intervening murder of another woman by the defendant. [758]

There was no reversible error at a murder trial in the judge's admission of certain tape recorded telephone conversations, portions of which occurred

prior to the defendant's acknowledging that he knew the conversations were being recorded, where timely objection was not made to the admissions, and where the portions of the conversations occurring prior to the defendant's acknowledgment contained nothing that would be prejudicial to the defendant. [759]

INDICTMENTS found and returned in the Superior Court on February 13, 1973.

The cases were tried before *Morse*, J.

*John F. Palmer* (*Richard G. Shalhoub* with him) for the defendant.

*James W. Sahakian*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. On November 22, 1978, the defendant, Anthony J. Jackson, was convicted of murder in the first degree and kidnapping. He was sentenced to life imprisonment and a term of from nine to ten years to be served consecutively at the Massachusetts Correctional Institution at Walpole. Both sentences were to be served from and after any sentences previously imposed.

The defendant appeals, claiming that he was denied his right to a fair trial by an impartial jury (1) because of prejudicial pretrial publicity, and (2) because the trial judge failed to excuse for cause jurors who were allegedly biased in favor of the police. He also claims error in the refusal of the judge to exclude from evidence (3) an admission allegedly made by the defendant which linked him to four other murders, (4) testimony by police concerning the defendant's conduct at the time of his arrest, and (5) portions of two tape recorded telephone conversations. We conclude that the defendant's claims lack merit, and, after reviewing the entire record as required by G. L. c. 278, § 33E, we conclude that he is not entitled to relief on any other ground. Accordingly, we affirm his convictions.

The facts are summarized as follows. The body of Damaris Synge Gillispie, a twenty-two year old college student, was found on February 3, 1973, in a heavily wooded area of Billerica. She

had been strangled to death. The autopsy indicated that her death occurred on or about November 29, 1972, the date on which she was last seen by her roommate at their apartment in Cambridge.

The victim left her apartment at 6:45 P.M. to go to her job at the Jazz Workshop in Boston. She was wearing open-toed, cork-soled shoes, a hooded brown fur coat with the initials "DSG" embroidered on the lining, a moonstone ring made from one of her grandfather's cuff links, and a turquoise and silver ring. When she failed to return to the apartment by the next morning, her boyfriend reported her missing to the Cambridge police and notified her family.

The victim's family tried to locate her by publicizing her disappearance. They arranged for newspaper and television coverage and for the distribution of leaflets containing two photographs of the victim, her description, and a "hotline" telephone number at her apartment. Three telephones were installed with a recording system to record incoming telephone calls.

The defendant lived at 154 Washington Street in Dorchester with three women: Patricia Archer, Michelle Maupin, and Diane Dixon. According to Archer, who testified for the Commonwealth, she returned home at approximately 11:30 P.M. on the night of November 29, 1972. The defendant was at the apartment. He told Archer that he had killed someone and had been driving all night with a body in his car (a 1967 gold Cadillac automobile with a dark vinyl top). He asked her to help him clean up the blood in his car before it dried, which she did. The defendant subsequently gave Archer a pair of shoes which had cork soles, worn heels, and spots of blood on them. When she went to put the shoes in the defendant's car, she noticed a moonstone ring and a silver and turquoise ring in the ashtray.

The owner of a dry cleaners located about one block from the defendant's apartment testified that the defendant had left a hooded brown fur coat to be cleaned. It appeared to have blood stains in the lining. The initials "DSG" were embroidered on the inside of the coat. The owner stated that he told the count-

er clerk to give it back to the defendant because it was fur and could not be cleaned.

On December 6, 1972, the victim's brother and one of her roommates were manning the hotline telephone at the victim's apartment. Each of them received a telephone call from an unknown male who provided information about the victim's jewelry, her friends, and her family. During the first conversation, after some introductory remarks, the caller had said, "You know, I know the phone is tapped — I'm hep to that, but I'm going to get in touch." During the second call, the caller had said, "I know the thing is being taped, but that's cool too." Numerous witnesses identified the voice of the caller as that of the defendant.

The defendant was arrested on unrelated charges on December 26, 1972. In connection with that arrest, he was convicted of armed assault with intent to murder and of unlawfully carrying a firearm. Testimony about the arrest was admitted at the trial in the instant case, over the defendant's objections.

Subsequent to his arrest, the defendant was visited by Donald McDonald, who testified for the Commonwealth. According to McDonald's testimony, the defendant told him to get a green metal box from the defendant's former wife and burn the contents, because among the contents were things that could convict him of murder. McDonald and the defendant's former wife threw the box from the Longfellow Bridge into the Charles River. It was subsequently recovered by the police and was found to contain over two hundred photographs of nude women, one of whom was the victim.

During a subsequent visit by McDonald, he and the defendant discussed a newspaper article depicting six murdered women. The defendant told McDonald, "The one in New Hampshire, that's not mine," and, "You know . . . I've got more respect for the FBI."

Shortly before the trial, a full page political advertisement promoting the then district attorney's campaign for reelection appeared in various newspapers in Middlesex county. This advertisement, as well as a leaflet distributed throughout Middlesex county, credited the incumbent district attorney

with obtaining the first conviction against the "hitchhike murderer." The hitchhike murders received extensive publicity in late 1972 and 1973, as did the defendant's trials in 1976, 1977, and 1978. Publication of the advertisement and distribution of the leaflets took place after the judge had admonished counsel "not to discuss this matter with the Press. . . . I mean the entire district attorney's office." The defendant's motion to dismiss for prosecutorial misconduct was denied by the judge.

The judge conducted an extensive voir dire of the jury. It lasted seven days and involved eighty-eight potential jurors. Several jurors were excused for cause and the judge allowed the defendant and the Commonwealth each to exercise twenty-two peremptory challenges. The judge refused to exclude for cause six jurors peremptorily challenged later by the defendant who had expressed a predisposition to credit police testimony.

1. *Pretrial publicity.* The defendant argues that his right to a fair trial by an impartial jury has been jeopardized by extraneous and prejudicial influences. His argument breaks down into two distinct claims: first, that prosecutorial misconduct warranted the dismissal of the defendant's indictments, and, second, that the extensive pretrial publicity mandated a change of venue.

The judge acknowledged that "[a]t the very least there was lack of good judgment on the part of the prosecutor," in permitting the publication and distribution of the political advertisement which referred to the "hitchhike murders," despite the fact that neither the defendant nor the victim was mentioned by name. He ruled, however, that the advertisement did not add significantly to the problem of prejudicial publicity that already existed. Absent prejudice to the defendant as a result of the advertisement, the actions of the prosecutor did not so seriously impair the defendant's right to a fair trial as to warrant dismissal of the charges. "Whether an indictment should be dismissed upon the defendant's motion where the prosecution has acted improperly, turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the impropriety." *Commonwealth* v. *Lamm Hue To, ante* 301, 312-313 (1984). The record before us does not indicate that the

political advertisement had any prejudicial effect in addition to or distinguishable from that caused by publicity due to the extensive media coverage of the hitchhike murders and subsequent trials. The defendant was not mentioned by name and, in some versions of the advertisement, the paragraph concerning the defendant was only one of several. Although it is possible that some jurors might have identified the defendant with the hitchhike murders as a result of this text, it is more likely that any knowledge of the jurors that the defendant was connected with other murders arose from other pretrial publicity.

The defendant argues however that the prosecutorial misconduct involved here warrants the sanction of dismissal of the indictments whether or not the defendant was prejudiced. He relies on our holding in *Commonwealth* v. *Manning*, 373 Mass. 438 (1977). In that case, Federal agents talked to the defendant and criticized the way his lawyer was handling his defense. Although the defendant's relationship with his lawyer was not jeopardized and there was no actual prejudice, this court ruled that dismissal of the indictment was appropriate. The purpose of the sanction was not to rectify harm done to the defendant, because there had been none; the point was to discourage government agents from such deliberate and insidious attempts to subvert the defendant's right to a fair trial by impairing his relationship with his attorney. The misconduct in *Commonwealth* v. *Manning, supra* at 444, was "so pervasive as to preclude any confident assumption that proceedings at a new trial would be free of the taint." The deliberate actions of the prosecutor in the instant case, while ill-advised, and possibly contrary to the provisions of S.J.C. Rule 3:07, DR 7-107, as appearing in 382 Mass. 788 (1981),[1] and II ABA Standards for Criminal Justice, Fair Trial and Free Press, Standards 8-1.1,

---

[1] DR 7-107 states, in pertinent part: "(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

8-2.1 (2d ed. 1982), do not rise to the level of seriousness of the misconduct in *Commonwealth* v. *Manning, supra,* and do not warrant the ultimate sanction of dismissal of the indictments.

The defendant also argues that the extensive pretrial publicity about the defendant and other crimes with which he was associated (publicity due only in small part to the advertisement published by the district attorney's reelection campaign) mandated a change of venue. The existence of pretrial publicity does not alone indicate that an impartial jury cannot be empanelled. *Dobbert* v. *Florida*, 432 U.S. 282, 302-303 (1977). Jurors need not be absolutely ignorant of the facts and issues involved in a case to be able to make an impartial judgment. *Id.* The judge carefully questioned each prospective juror to determine whether he or she had any information about the case, either from the news media or from conversations with other prospective jurors, and whether he or she had formed an opinion or was prejudiced thereby. The record shows that most jurors had no prior knowledge of the case.[2] When answers were unclear or indicated knowledge, the judge asked further questions. He also made further inquiries at the request of counsel. None of the jurors selected indicated that he or she had an opinion about the case which would affect his or her ability to consider the evidence impartially. "The dominant consideration . . . is not the views to which the jurors have

---

"(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

" . . . .

"(D) During the selection of a jury or the trial of a criminal matter, a lawyer . . . shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial . . . ."

[2] Although there had been an immense amount of publicity at the time of the murders in 1972 and 1973, and then around the time of the subsequent trials (see *Commonwealth* v. *Jackson*, 384 Mass. 572 [1981], and *Commonwealth* v. *Jackson*, 370 Mass. 502 [1976]), most of the publicity had dissipated before the beginning of the instant trial; the only articles published around the time of the trial concerned the empanelment of the jury.

been exposed; it is what is their commitment, if any, in their own opinions, or their own expressions." *Commonwealth* v. *Subilosky*, 352 Mass. 153, 158-159 (1967). See *Commonwealth* v. *Gilday*, 367 Mass. 474, 491-492 (1975). The judge has broad discretion to decide, after conducting the voir dire, whether jurors have been contaminated by extraneous information. *Commonwealth* v. *Brown*, 386 Mass. 17, 30 (1982). We conclude that the judge did not abuse his discretion in relying on the measures he took to ensure the defendant an impartial jury. There is no indication in the totality of the circumstances that the defendant was denied a fair trial because of pretrial publicity. *Murphy* v. *Florida*, 421 U.S. 794, 799 (1975).

2. *Juror prejudice.* During the jury selection process, the judge inquired of each prospective juror whether he or she would be more likely to believe the testimony of a police officer than that of a lay witness. The judge found indifferent six jurors who indicated a predisposition to credit police testimony, and the defendant exercised a peremptory challenge to excuse each one. The defendant argues that the judge's failure to excuse these jurors for cause violated his right to a fair and impartial jury.

The record shows that the judge was thorough in his examination of the six jurors who expressed some disposition to give greater credit to police testimony. Four of the six jurors gave detailed explanations of their predisposition, and, after extensive questioning of all six by the judge, each indicated that he or she could follow instructions to consider the evidence impartially. The judge did not abuse his discretion in refusing to excuse these jurors for cause.

By statute, a judge may have an obligation to examine prospective jurors fully with respect to possible bias or prejudice. G. L. c. 234, § 28.[3] Whether a juror should be excused on the

---

[3] General Laws c. 234, § 28, as amended through St. 1975, c. 335, states in pertinent part: "[I]f it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including . . . possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations, attitudes . . . [or] opinions."

basis of the results of an examination is within the discretion of the judge. *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982). Even if a juror originally indicates that he or she might give more weight to the testimony of a police officer than to that of a lay witness, such a response would not necessarily disqualify a person. Cf. *Commonwealth* v. *Nickerson*, 388 Mass. 246, 249 (1983). See *People* v. *Macias*, 44 Colo. App. 203, 205 (1980); *State* v. *Baldwin*, 388 So. 2d 664, 671 (La. 1980); *State* v. *Williams*, 617 S.W.2d 98, 99 (Mo. Ct. App. 1981). Contra *Hernandez* v. *State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978).

3. *Evidence of other crimes.* The defendant contends that it was reversible error for the judge to allow Donald McDonald to testify about a conversation he had with the defendant regarding a newspaper article which contained pictures of six murdered women. McDonald testified that the defendant said, "The one in New Hampshire, that's not mine. You know me better than that. I've got more respect for the FBI." The argument that this testimony should have been excluded because the admission, which is obviously relevant to the issue of who murdered Gillispie, also constitutes evidence of the defendant's participation in other murders, was raised and rejected in *Commonwealth* v. *Jackson*, 384 Mass. 572, 577-579 (1981), and we will not go over that ground again.

Here, the defendant also objects to the admission of the testimony because, he alleges, it was not clear that the defendant and McDonald were referring to the same newspaper article and the testimony, therefore, lacked sufficient indicia of reliability. It is clear from the transcript of the voir dire that the judge was satisfied that the prosecution had laid a sufficient foundation for the admission of this evidence. Although the article was not physically present during the conversation between the defendant and McDonald, there was testimony from which the jury could infer that they were referring to the same article, the only one with pictures of the six slain women. See *Commonwealth* v. *Jackson*, 384 Mass. 572, 578 n.1 (1981). The decision to admit the evidence on the basis of this foundation was within the discretion of the trial judge. See

*Commonwealth* v. *Williams*, 378 Mass. 217, 229 (1979); *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 673 (1980).

4. *Evidence of the defendant's arrest.* The defendant's claim that evidence of the chase and shoot-out with police on December 26, 1972, which preceded his arrest should have been excluded has also been before this court before. See *Commonwealth* v. *Jackson*, 388 Mass. 98, 103 (1983). There we said that the evidence of flight was properly admitted to show the defendant's consciousness of guilt. *Id.* The defendant attempts to distinguish the present case on the basis of the proximity of the flight to the time fixed for the murder. In *Commonwealth* v. *Jackson*, 388 Mass. 98 (1983), the murder was committed between December 22 and December 24, 1972. The arrest occurred at the most four days later. On the other hand, the murder of Gillispie was estimated to have occurred on November 29, 1972, approximately one month prior to the arrest. The defendant argues that the probative worth of this evidence is undercut because the one-month hiatus and the intervening murder of another woman suggest that, if the defendant was feeling guilty on December 26, it was not because of the Gillispie murder. The relevancy of evidence of flight in such circumstances is within the discretion of the trial judge and his finding will not be disturbed unless it is palpably unreasonable. See *Commonwealth* v. *Sawyer*, 389 Mass. 686, 700 (1983); *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982), and cases cited . It was not unreasonable for the judge in this case to conclude that the defendant had in his mind on December 26 all of the crimes for which the police might be interested in locating him.

The defendant's objection that this testimony should not have been admitted because it was prejudicial in that it portrayed the defendant as a "guntoting desperado" and described the defendant's attempts to persuade a woman to get into his car is also without merit. "Balancing the probative value of evidence against its possible prejudicial impact is a task committed to the discretion of the judge." *Commonwealth* v. *Jackson,* 388 Mass. 98, 103 (1983). We see no reason to disturb the judge's decision to admit the evidence.

*5. The admission of tape recorded telephone conversations.* Finally, the defendant argues that the judge committed reversible error when he admitted in their entirety recordings of two telephone calls made by the defendant to the victim's brother and roommate. These recordings were the subject of our decision in *Commonwealth* v. *Jackson*, 370 Mass. 502 (1976), where we held that they were lawfully recorded under G. L. c. 272, § 99, and that portions of them could be admitted in evidence. The defendant argues that what we held to be admissible in 1976 was only that part of each tape *after* the defendant acknowledged that he knew the telephone call was being recorded. *Id.* at 505. Even if this interpretation of our holding is correct the admission of both tapes in their entirety does not constitute reversible error. First, the defendant did not make timely objection to the admissions. On the third day of the trial the recordings were played twice before the jury and were admitted as exhibits without objection. The record shows that counsel was aware that portions of the recordings had been suppressed. On the fifth day, the defendant moved for a mistrial and to strike the suppressed portions of the recordings. "[W]hen something occurs which constitutes the basis for requesting a mistrial it must be called to the attention of the judge immediately, or when the aggrieved party first learns of it, . . . If this is not done seasonably, the incident may not be availed of later as the basis for a claim of appellate review." *Commonwealth* v. *DiPietro*, 373 Mass. 369, 387 (1977). Furthermore, the portion of each call that occurred before the defendant stated that he knew the calls were being taped is quite brief and contains no conversation of substance that would be prejudicial to the defendant. Therefore, the admission of those portions of the telephone calls not dealt with in *Commonwealth* v. *Jackson*, 370 Mass. 502 (1976), did not prejudice the defendant.

*6. Review under G. L. c. 278, § 33E.* We have considered the defendant's claims at length and conclude that they lack merit. After review of the entire record pursuant to G. L. c. 278, § 33E, we find no basis on which to disturb the verdict of guilty of murder in the first degree.

*Judgments affirmed.*