COMMONWEALTH vs. ANTHONY J. JACKSON.

Middlesex.  October 4, 1982. — January 28, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Homicide.  Evidence,* Other offense, Flight, Relevancy and materiality, Admissions and confessions, Production on demand.  *Constitutional Law,* Production of evidence on demand, Assistance of counsel.  *Due Process of Law,* Expenses in criminal proceeding, Defendant wearing prison clothing at trial.  *Practice, Criminal,* Fair trial, Disclosure of evidence.  *Witness,* Impeachment.

At the trial of indictments for murder and other serious crimes the judge did not abuse his discretion in admitting, as tending to show consciousness of guilt, evidence that the defendant engaged in a "chase and shootout" with police prior to his arrest, and the fact that the arrest was on charges unrelated to those for which the defendant was on trial went only to the weight of this evidence.  [103-104]

The defendant at a criminal trial was not unfairly prejudiced by the admission, with appropriate limiting instructions, of testimony concerning the details of his arrest, where the testimony explained the recovery of certain relevant evidence and its connection with the defendant.  [103-104]

Where the testimony at the trial of indictments for murder, kidnapping, and rape established that .22 caliber shells had been found in the victim's apartment and car, the judge acted within his discretion in admitting in evidence two guns of that caliber belonging to the defendant, and the lack of ballistic testimony linking the shells with the guns went only to the weight of this evidence.  [104-105]

The judge at a murder trial did not abuse his discretion in admitting in evidence statements by the defendant admitting the murder for which he was on trial and implicating himself in other crimes, where the record showed that the judge had balanced the probative value of the statements against their prejudicial impact and had redacted portions of the statements.  [105-106]

The defendant at a criminal trial was not prejudiced by brief and scattered references to previous instances of his arrest and trial.  [106]

The denial of a criminal defendant's motion to compel the prosecution to provide him with a sample of the hair of a prospective prosecution witness did not, particularly in the absence of any showing that the de-

fendant could not obtain such a sample on his own, violate either the defendant's rights to cross-examination and compulsory process under the Sixth Amendment to the Federal Constitution or his right of access to witnesses, as protected by art. 12 of the Massachusetts Declaration of Rights. [106-107]

The record of a criminal trial disclosed no factual basis for the defendant's claim that he had been compelled to wear idehtifiable prison clothing during his trial, in violation of his constitutional due process rights. [107-108]

The totality of the circumstances of a criminal trial did not indicate either that prejudicial pretrial publicity had deprived the defendant of a fair trial or that the judge abused his discretion in relying on questioning and sequestration of jurors in order to secure an impartial jury. [108-110]

A criminal defendant's general request for disclosure of exculpatory evidence within the prosecutor's control, even if it were to be considered in combination with certain defense motions requesting production of police and probation records of witnesses, would not have given notice such as to warrant treatment of the request as a specific one for certain disputed items of evidence. [110]

Failure of the prosecution to disclose a certain police report and portions of the criminal records of two prosecution witnesses in response to a defendant's general request for disclosure of exculpatory evidence did not deprive the defendant of due process of law, where the police report would not have raised a reasonable doubt that did not otherwise exist, and where, in light of the testimony at trial, the records would have been repetitious and cumulative. [111-113]

The record of a criminal trial did not present the issue whether the judge had impermissibly refused to permit impeachment of a witness by means of her juvenile record. [113]

The defendant at a murder trial was not denied the effective assistance of counsel by reason of his trial attorney's decisions not to impeach one witness with certain inconsistent statements and not to cross-examine another witness as to the extent of her involvement in a different murder, where sound reasons existed for the attorney to adopt these tactics. [113-114]

INDICTMENTS found and returned in the Superior Court on March 12, 1973.

The cases were tried before *Dwyer*, J.

*J. Russell Hodgdon* for the defendant.

*James W. Sahakian*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.   On December 22, 1976, the defendant, Anthony J. Jackson, was convicted of murder in the first degree, kidnapping, rape, and unarmed robbery, and sentenced to life imprisonment at the Massachusetts Correctional Institution at Walpole on the murder conviction.[1] He challenges his convictions on direct appeal and by means of a motion for a new trial.   We conclude that the defendant's claims lack merit, and, after reviewing the entire record as required by G. L. c. 278, § 33E, we conclude that the defendant is not entitled to relief on any other grounds. Accordingly, his convictions are affirmed.

The facts are summarized as follows.   The victim was found dead under a bed in her apartment at One Langdon Street in Cambridge on the morning of Sunday, December 24, 1972.   She was last seen alive at approximately 8 P.M. on Thursday, December 21.   It was estimated that her death occurred no earlier than 11:30 A.M. on Friday, December 22.   She did not report to work on Friday, and attempts to reach her by telephone and by visits to her apartment between Friday and Sunday were unsuccessful.   However, at about midnight on Saturday, her car was found parked near her sister's apartment building several blocks from where the victim lived.   Several .22 caliber bullet shells were found in her apartment, and spent .22 caliber bullet shells were found in her car.   Several items were missing from her apartment.

The defendant lived in an apartment at 154 Washington Street in the Dorchester section of Boston with one Michelle Maupin, one Patricia Archer, and one Diane Dixon.   Maupin and Archer testified for the Commonwealth at the trial.   According to Maupin, the defendant left the apartment in the early evening on Thursday, December 21, and returned

---

[1] The defendant was also sentenced to imprisonment at the Massachusetts Correctional Institution at Walpole, for a term of not more than ten nor less than five years for kidnapping, not more than thirty nor less than twenty years for rape, and not more than thirty nor less than twenty years for unarmed robbery, the sentences to be served concurrently after the expiration of the sentence for murder in the first degree.

about 6 or 6:30 A.M. on Friday morning, December 22. He left again about 9 A.M., and returned about 11 A.M. He left again at 11:30 A.M. and returned at 1:30 P.M. with some furniture, which he moved into the apartment with the help of one Donald McDonald. McDonald testified that the defendant called him at 11:30 A.M., Friday, and asked him to help move some furniture, and confirmed that they picked up the furniture and returned to Dorchester at 1:30 P.M. The defendant left again about 8 P.M. and returned by car early Saturday morning, December 23. Archer's testimony was essentially consistent with Maupin's. Both testified that the defendant gave them money and items later identified as from the victim's apartment, at various times on that Friday, Saturday, and Sunday. Archer testified that she spent part of Saturday, December 23, with the defendant in an apartment he had rented under Dixon's name at 55G Codman Park. At 11:30 that night she drove past a building on the corner of Langdon Street and Massachusetts Avenue with the defendant, and he stated that he and Mc-Donald knew a couple of girls there. The defendant's former wife, Patricia Jackson, testified that he visited her on Friday afternoon and late Saturday afternoon at her apartment.

On December 30, 1972, the victim's father received a copy of her bank statement with a cancelled check for $593 endorsed by "Robert Johnson." An expert testified that the defendant's fingerprints were on the check. The Commonwealth also introduced photographs taken by a video camera at a branch of the Coolidge Bank & Trust Company showing a black man in the teller's line. An assistant manager identified this black man as the man who brought the check to him for approval on the morning of December 22, but at trial he did not identify that man as the defendant.

The defendant was arrested on unrelated charges on December 26, 1972. In June, 1976, the defendant was convicted of armed assault with intent to murder and of unlawfully carrying a firearm in connection with that arrest. The convictions were affirmed. *Commonwealth* v. *Jackson,*

376 Mass. 790 (1978). Testimony about that arrest was admitted at the trial in the instant case, over the defendant's objections. Hair samples from a hat taken from the defendant at that arrest were found to be "microscopically like" a hair found in the victim's apartment.

Maupin visited the defendant several times between his arrest and his trial. She testified that on December 29, he told her to take several items, including two jackets and a .22 caliber rifle, from his apartment to Patricia Jackson's apartment. She did so, and also brought a .22 caliber handgun back from Patricia Jackson's apartment to the Washington Street apartment. At the defendant's request, McDonald and Patricia Jackson threw the rifle into the Charles River on January 6, 1973. They also disposed of other objects on that date at his request, including the two jackets and several of the items taken from the victim's apartment. Some of these objects, including the rifle, were later recovered by the police. Both guns were admitted in evidence at trial, over the defendant's objections.

McDonald was given immunity from prosecution as an accessory after the fact to any murders for which the defendant was prosecuted. He testified at trial to incriminating statements the defendant made when he visited the defendant in jail in January, 1973. The Commonwealth also offered the testimony of Ralph Bens, one of the defendant's jailors, regarding an inculpatory statement made by the defendant. The defendant objected to this testimony by McDonald and Bens.

The defense was alibi. Two nurse's aides testified that they spent a Friday or Saturday evening in December, 1972, with a black man named Tony and a white man named Brian. McDonald sometimes used the name Bryant Alexander. One of the women testified that she spent the night with the black man, whom she identified at trial as the defendant. While there was some evidence that this encounter took place on December 22, there was other evidence that it took place several weeks earlier.

1. The defendant objects to the admission of certain evidence of the defendant's alleged involvement in other crimes. Evidence of other crimes is not ordinarily admissible at trial. *Commonwealth* v. *Roberts*, 378 Mass. 116, 125 (1979). *Commonwealth* v. *Kosior*, 280 Mass. 418, 423 (1932). "However, otherwise relevant evidence is not rendered inadmissible simply because it may indicate that the defendant has committed another offense." *Commonwealth* v. *Roberts, supra. Commonwealth* v. *Jackson*, 384 Mass. 572, 577 (1981).

(a) The defendant first objects to the admission of testimony about a chase and shoot-out with police which preceded his arrest. This evidence of flight was properly admitted to show the defendant's consciousness of guilt. *Commonwealth* v. *Booker*, 386 Mass. 466, 469-471 (1982). *Commonwealth* v. *Roberts, supra* at 125. *Commonwealth* v. *Gilday*, 367 Mass. 474, 496 (1975). The fact that the defendant was arrested on unrelated charges does not render the evidence inadmissible, but rather goes to the weight which the jury will give to the evidence. *Commonwealth* v. *Booker, supra* at 470. Nor is there merit in the defendant's contention that he was unfairly prejudiced because the judge allowed Commonwealth witnesses to describe in detail the circumstances of his arrest. Balancing the probative value of evidence against its possible prejudicial impact is a task committed to the discretion of the judge. *Commonwealth* v. *Booker, supra* at 469. *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962). That principle controls here. We have upheld the admission of evidence of a "running gunfight with police, in which an officer was wounded," because the "desperate nature of the defendant's conduct . . . lent credibility to the . . . inference of guilt of the crimes charged." *Commonwealth* v. *Gilday, supra.* See *Commonwealth* v. *Green*, 302 Mass. 547, 553 (1939) ("testimony of one [witness] as to the details of the robbery [of a car]" admissible to show intensity of defendant's desire to escape, indicating consciousness of guilt). Moreover, in this case relevant evidence was

recovered in the course of the defendant's arrest. The jury were entitled to know how this evidence was recovered and identified with the defendant. The judge instructed the jury that testimony about the arrest was "not to be used by you as a basis for a verdict of guilty in the cases that we are now trying." Jurors are expected to follow such instructions. *Commonwealth* v. *Stone*, 366 Mass. 506, 512-513 (1974). *Commonwealth* v. *Ciminera*, 11 Mass. App. Ct. 101, 105 (1981). We conclude that there was no error in the admission of evidence describing the defendant's arrest.

(b) The defendant next objects to the admission in evidence of two .22 caliber guns, on the ground that they were irrelevant. Although the victim was not shot, .22 caliber shells were found in her apartment and car. Since it thereby appeared that one or both guns might have been used in the commission of the crimes of kidnapping or rape, the guns were relevant. *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). Compare *Commonwealth* v. *Banuchi*, 335 Mass. 649, 654 (1957) (when defendant was charged with arson, it was error to admit knife with which defendant allegedly threatened wife). It was not necessary to provide expert ballistics testimony linking the shells with the defendant's guns. There was testimony establishing that the shells and guns were of the same caliber, and that shells of the same caliber were found in the defendant's apartment; the jury could infer that the shells were connected with the defendant's guns. See *Commonwealth* v. *O'Toole, supra.* The absence of expert testimony expressly linking the shells with the guns went only to the weight of the evidence. Cf. *Commonwealth* v. *Ellis*, 373 Mass. 1, 5 (1977) (absence of murder weapon did not preclude admission of expert testimony comparing shell found near murder scene to shells allegedly fired from the same gun). Alternatively, the fact that the defendant asked McDonald to dispose of one of the guns was admissible to show consciousness of guilt.

Since the guns were relevant, it was within the judge's discretion to admit them in evidence if he found their probative worth outweighed their prejudicial impact, even

though they might tend to show that the defendant had committed another crime. See *Commonwealth* v. *Booker,* 386 Mass. 466, 469-470 (1982); *Commonwealth* v. *D'Agostino,* 344 Mass. 276 (1962). We see no basis on which to interfere with his decision. We note that the judge gave strong limiting instructions at the time the challenged evidence was introduced, which cured any possible error. See *Commonwealth* v. *Stone, supra.*

(c) The defendant's third objection is that the judge improperly allowed McDonald and Bens to testify to statements the defendant made which implicated him in other crimes.[2] The jury could reasonably have inferred that these statements were admissions by the defendant to the murder of the victim in this case. As such they were relevant, even though they tended to implicate the defendant in other crimes. See *Commonwealth* v. *Jackson,* 384 Mass. 572, 577 (1981); *Commonwealth* v. *Roberts,* 378 Mass. 116, 125-126 (1979); *Commonwealth* v. *Deschamps,* 1 Mass. App. Ct. 1, 3 (1972). The contested statements simultaneously represented admissions to the murder of the victim in this case and implicated the defendant in other crimes. "We conclude that, because the defendant, in his admission[s] of the crime charged, admitted to other, unrelated crimes in a manner that rendered the admission[s] unintelligible if references to the unrelated crimes were omitted, the entire admission[s] [were] properly admitted in evidence." *Commonwealth* v. *Jackson, supra* at 578. A judge has discretion in considering the admissibility of evidence of other crimes. *Id. Commonwealth* v. *Deschamps, supra.* Here, the judge carefully balanced the probative value of these statements

---

[2] The defendant challenges the admission of the following statements. Bens testified that, when he read to the defendant a copy of his indictment for the victim's murder, the defendant responded: "Wait until the spring thaw. You will find more." McDonald testified that he and the defendant discussed newspaper items which related the facts of the murder, and that the defendant responded: "There's a couple they don't even know about." McDonald also testified that the defendant stated: "I was becoming more professional with every one . . . [;] the more you do a thing, the better you get at it. I was getting bolder and bolder."

against their prejudicial impact, and redacted portions of the statements. We see no abuse of discretion.

(d) The defendant last objects to references by several police officers testifying at trial to prior trials of the defendant, and to a reference by an FBI fingerprint analyst to "prior-arrest fingerprint cards on file." These references were brief and scattered, and were not elicited in bad faith. In each case, the defendant either failed to object to the reference, or succeeded in having it struck, in several instances with appropriate and curative instructions. We conclude that the defendant was not prejudiced by these references to a previous arrest and trial.

2. Prior to the trial, the defendant moved that the Commonwealth be ordered to provide him with a sample of McDonald's hair. After discussion, the judge denied the motion without prejudice to the defendant's renewing it "[i]f it becomes more material during the course of this trial." The defendant asserts that this was reversible error, because it unfairly denied him an opportunity to present evidence that might have buttressed his theory that McDonald killed the victim.

The defendant relies in part on his rights to cross-examination and compulsory process under the Sixth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment. *Washington* v. *Texas*, 388 U.S. 14 (1967). See *Chambers* v. *Mississippi*, 410 U.S. 284, 294-295 (1973); *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94 (1978). However, the defendant has not referred us to any case which extends these Sixth Amendment guaranties beyond testimonial evidence to the production of real evidence of the type sought here. Moreover, the defendant has not shown that the judge prevented him from introducing this evidence at trial. The defendant failed to establish that he could not have obtained a hair sample from McDonald on his own. In addition, his failure to renew the motion at trial suggests that the defendant chose to abandon his attempt to get a hair sample from McDonald.

The defendant's reliance on *Commonwealth* v. *Balliro,* 349 Mass. 505, 516-518 (1965), is similarly misplaced. In *Balliro,* we held that, under art. 12 of the Massachusetts Declaration of Rights, the Commonwealth could not prevent defense counsel from interviewing individuals who were being held by the Commonwealth as material witnesses. Here, the Commonwealth does not seek to prevent the defendant from obtaining access to evidence in the Commonwealth's control which should be available to both sides; rather, the defendant seeks to compel the Commonwealth to obtain evidence for him from an independent third party. Cf. *Commonwealth* v. *Campbell,* 378 Mass. 680, 702 (1979) (prosecutor not obliged to obtain Department of Correction records for defendants). We will not extend *Balliro* to this situation, particularly absent a showing that the defendant was unable to obtain a hair sample on his own. But see *Evans* v. *Superior Court,* 11 Cal. 3d 617, 623-626 (1974) (in circumstances of case, denial of defense request for line-up was abuse of discretion).

3. In *Estelle* v. *Williams,* 425 U.S. 501 (1976), the Supreme Court held that it is unconstitutional to compel a defendant to stand trial in identifiable prison clothing. The defendant contends that, because the judge would not authorize funds to buy him new clothes, he was unconstitutionally compelled to appear in identifiable prison garb during the voir dire of prospective jurors. He argues that, since he had no proper clothes and was unable to pay for such clothing, the State had a constitutional obligation to provide him with funds to buy suitable clothing. See *Bentley* v. *Crist,* 469 F.2d 854, 856 (9th Cir. 1972). Cf. *Commonwealth* v. *Tessier,* 371 Mass. 828 (1977) (State not required to pay for indigent to have independent blood-alcohol test). The Supreme Court has not addressed this issue, nor has it applied *Estelle* v. *Williams, supra,* to pretrial proceedings. But see *Boswell* v. *Alabama,* 537 F.2d 100, 102-103 & n.7 (5th Cir. 1976); *Gaito* v. *Brierley,* 485 F.2d 86, 88-90 (3d Cir. 1973).

We do not consider these issues now, because we conclude, after a careful review of the record, that the defendant was not compelled to wear his prison clothes. It appears that the defendant had an adequate wardrobe; he claimed his clothing no longer fit him. The judge questioned this claim, and asked defense counsel to verify it and to explore the possibility of altering the defendant's clothing, before he authorized funds for new clothes. It was never clearly established that the clothing did not fit. After several discussions of the issue, defense counsel could report only that the clothes were "[t]oo small, I think." However, it appears that the defendant came to trial on one occasion wearing one of his old suits. We note that during voir dire defense counsel stated that the problem did not have to be resolved "today or tomorrow, but this case is going to take a long time." The entire record suggests that the judge tried to work with defense counsel to resolve the problem, and would have been willing to authorize funds if he had found it was necessary. Thus, even assuming that the State is obliged to provide suitable clothing during voir dire to a defendant unable to afford such clothing, we find no constitutional violation on this record. In any event, given the overwhelming evidence of the defendant's guilt, any error relating to the defendant's clothing was harmless beyond a reasonable doubt. See *Estelle* v. *Williams, supra* at 506-507; *Chapman* v. *California,* 386 U.S. 18, 21-24 (1967).

4. The defendant contends that extensive, prejudicial pretrial publicity deprived him of his constitutional right to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd,* 366 U.S. 717, 722 (1961). *Murphy* v. *Florida,* 421 U.S. 794, 799 (1975). *Commonwealth* v. *Jackson,* 376 Mass. 790, 799 (1978). The existence of pretrial publicity does not alone indicate that an impartial jury cannot be empanelled. *Dobbert* v. *Florida,* 432 U.S. 282, 302-303 (1977). *Murphy* v. *Florida, supra* at 800. Nor need qualified jurors be "totally ignorant of the facts and issues involved." *Id. Dobbert* v. *Florida, supra. Commonwealth* v. *Blackburn,* 354 Mass. 200, 204 (1968). The question is

whether there are "any indications in the totality of cir-
cumstances that [the defendant's] trial was not fundamen-
tally fair." *Murphy* v. *Florida, supra* at 799. *Dobbert* v.
*Florida, supra* at 303.

The defendant submitted a pretrial exhibit containing ap-
proximately 216 newspaper and three magazine articles
published between December 27, 1972, and September 1,
1976. In his findings on the motion for a new trial, the
judge found that these articles reported the death of the vic-
tim in this case and of several other young women, the in-
vestigation into these deaths and speculation that one per-
son might be responsible, the defendant's indictments in
1973 for four murders, the defendant's frequent changes of
counsel, and the postponements of his trial. The judge
found that these articles were generally factual in nature,
and were not inflammatory. Moreover, most of the pub-
licity had dissipated well before the defendant's trial; only
five of these articles were published in 1975, and only three
in 1976, the year of the trial. These factors have been con-
sidered significant in cases holding that a defendant was not
unfairly prejudiced by pretrial publicity. See *Murphy* v.
*Florida, supra* at 802; *Commonwealth* v. *Smith,* 357 Mass.
168, 173 (1970); *Commonwealth* v. *McLaughlin,* 352 Mass.
218, 225, cert. denied, 389 U.S. 916 (1967); *United States* v.
*Gullion,* 575 F.2d 26, 30 (1st Cir. 1978).

The judge carefully questioned each prospective juror to
determine whether he or she had gained any information
about the case from the news media, and whether he or she
was prejudiced thereby. See *Commonwealth* v. *Gilday,*
367 Mass. 474, 492 (1975); *Commonwealth* v. *Smith, supra*
at 172; *United States* v. *Gullion, supra* at 30-31. Cf. *Com-
monwealth* v. *Vitello,* 367 Mass. 224, 236-237 (1975) (even
in face of frequent and vigorous newspaper publicity up to
the date jury were empanelled, sufficient to question venire
and seated jury rather than each prospective juror individu-
ally). The record shows that, while some individuals knew
that the defendant was charged with other crimes, most
knew nothing about the case or knew only the defendant's

name, the victim's name, and the charge. See *Murphy* v. *Florida, supra*; *Commonwealth* v. *Smith, supra* at 173. The jury were sequestered after empanelling. See *Commonwealth* v. *Gilday, supra*; *Commonwealth* v. *Vitello, supra* at 237. We conclude that the judge did not abuse his discretion in relying on these measures to secure an impartial jury. See *Commonwealth* v. *Subilosky,* 352 Mass. 153, 158 (1967). There is no indication in the totality of circumstances that the defendant was denied a fair trial.

5. The defendant claims that the prosecution failed to disclose exculpatory evidence within its control, in violation of *Brady* v. *Maryland,* 373 U.S. 83 (1963). See *Commonwealth* v. *Ellison,* 376 Mass. 1, 21 (1978). The disputed evidentiary items were a Brockton police report and portions of Archer's and Maupin's criminal records. The defendant admits that he filed only a general request for exculpatory evidence. He argues that this general request should, in effect, be combined with other motions filed requesting production of "state, county or police department reports," and of probation records of witnesses, and treated as a specific request for the disputed items. We disagree. A specific request must "provide the Commonwealth with notice of the defendant['s] interest in a particular piece of evidence." *Commonwealth* v. *Wilson,* 381 Mass. 90, 109 (1980). See *Commonwealth* v. *Pisa,* 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977); *United States* v. *Sheehan,* 442 F. Supp. 1003, 1008 (D. Mass. 1977). Whatever the merits of the defendant's argument in other circumstances, the requests for broad categories of evidence (police reports and probation records) made here did not give the prosecutor such notice. Accordingly, we review the defendant's claims under the standard of materiality for a general request: "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record." *United States* v. *Agurs,* 427 U.S. 97, 112 (1976). *Commonwealth* v. *Collins,* 386 Mass. 1, 9-10 (1982). *Commonwealth* v. *Wilson, supra* at 107.

(a) In the course of their investigation of the death of one Sandra Ehramjian, officers of the Brockton police department interviewed one Adelle Swirsky, who worked at a jewelry store in Brockton. The officers' report states that "she can recall Jackson being in the store . . . around the Wednesday or Thursday before Christmas of '72." However, at the hearing on the defendant's motion for a new trial in the instant case, Mrs. Swirsky testified that the defendant was at the store sometime between 12 noon and 2 P.M. on Saturday, December 23, 1972.

There was no evidence that the district attorney's office for the northern district, which prosecuted the instant case, knew of the Brockton police report. As part of its attempt to coordinate and facilitate investigations into the deaths of several young women, including the victim in this case and Sandra Ehramjian, the Attorney General's office had collected over 2,400 pages of information. The Brockton police report was in these files under the name Sandra Ehramjian, and was disclosed at the defendant's trial for her murder. That trial took place after the trial in the instant case.

The police report was not exculpatory on its face in the instant case, since the victim was seen alive at 8 P.M. on Thursday, December 21. In any event, we conclude that disclosure was not required because the police report was not material. At best, it could have led to an alibi for a small portion of the afternoon of Saturday, December 23, 1972. In light of the overwhelming evidence of the defendant's guilt, this was not sufficient to raise a reasonable doubt that did not otherwise exist. *United States* v. *Agurs, supra*.[3]

---

[3] The defendant argues that the report would have attacked Archer's credibility, because she testified that she was with the defendant at that time. His assertion is not supported by the record, as Archer testified that she "was not with him totally all that time" on Saturday, December 23, 1972. We also note that the judge found that the defendant called the store from Dorchester at 10 A.M. on December 23, and that this evidence would have been inculpatory, since it contradicted the defendant's alibi evidence which placed him in New Hampshire until at least 11 A.M. on that day.

(b)   The defendant contends that the prosecution failed to disclose portions of Archer's and Maupin's criminal records, which would have established that at the time of her testimony at the defendant's trial, Archer was charged with uttering a false prescription and falsely making a prescription, and that Maupin, under the alias Margaret Tatum, was under a suspended sentence on prostitution charges when she made statements to the police incriminating the defendant.   The defendant argues that these records were exculpatory and material because they would have tended to show that Archer and Maupin had reason to cooperate with the Commonwealth in the instant case.

Evidence tending to show that important government witnesses are *biased* is exculpatory within the meaning of *Brady* v. *Maryland,* 373 U.S. 83 (1963).   See *Giglio* v. *United States,* 405 U.S. 150 (1972); *Commonwealth* v. *Ellison,* 376 Mass. 1, 22 (1978).   However, the defendant does not suggest that the Commonwealth made any promises or inducements to Archer or Maupin based on the charges described in the records, and the judge found in considering the motion for a new trial that no such promises were made.   Mere proof of the existence of criminal records falls far short of establishing bias.

Moreover, while evidence that tends to show that a government witness is biased is exculpatory, "[w]here it is . . . cumulative . . . courts generally reject the contention that such evidence is material . . . so long as the defense had an adequate opportunity to impeach the witness by other means" (citations omitted).   *Zeigler* v. *Callahan,* 659 F.2d 254, 266 (1st Cir. 1981).   See *Commonwealth* v. *Bernard,* 6 Mass. App. Ct. 499, 508-509 (1978), S. C. 378 Mass. 24 (1979); *United States* v. *Imbruglia,* 617 F.2d 1, 7 (1st Cir. 1980); *United States* v. *Shelton,* 588 F.2d 1242, 1248 (9th Cir. 1978), cert. denied, 442 U.S. 909 (1979).   Archer testified that, when she gave statements to the police, she was under arrest for the murder of Charlene Sustakowsky, and that the judge who dismissed the charges (in June of 1974) told her that nothing would happen to her as long as she

cooperated. She testified that charges against her for receiving stolen goods and for prostitution and lewdness were also dismissed, in the former case with a promise from the police to "see what we can do." She also testified that she was a prostitute.

Archer's testimony established that she had good reason to wish to curry favor with the Commonwealth. Similarly, the jury heard testimony that Maupin was a prostitute and that she was involved in the Sustakowsky murder. In light of this testimony, the judge correctly concluded in his findings that Archer and Maupin were placed in their "proper setting," and that the disputed evidence "would have been . . . repetitious and cumulative." We cannot say that the records were sufficient to raise a reasonable doubt that did not otherwise exist. *United States* v. *Agurs, supra.*

6. The defendant argues that the judge impermissibly refused to allow him to impeach Maupin with her prior juvenile record. *Davis* v. *Alaska,* 415 U.S. 308 (1974). *Commonwealth* v. *Ferrara,* 368 Mass. 182 (1975). The record does not establish that the judge denied any such request, and, after the hearing on the motion for a new trial, the judge found that the request, if any, was not renewed after Maupin had testified. The defendant's failure to renew his request vitiates any alleged error. *Commonwealth* v. *Adams,* 374 Mass. 722, 732-733 (1978), and cases cited. Moreover, we agree with the judge that the "record would have added little, if anything, to defendant's efforts to impeach the witness. There was ample testimony concerning her character and involvement in another murder." Thus, the defendant was not prejudiced by his inability, if any, to impeach Maupin with this record.

7. The defendant contends that he was denied the effective assistance of counsel because his trial counsel did not impeach Patricia Jackson with certain prior inconsistent statements, and did not cross-examine Maupin on the extent of her involvement in the Sustakowsky murder.

In evaluating a claim of ineffective assistance of counsel, we consider whether "the conduct of [the] lawyer was

'measurably below that which might be expected from an ordinary fallible lawyer.' . . . In addition . . . , our cases usually require a demonstration of prejudice resulting therefrom." *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979), quoting *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). *Commonwealth* v. *Daigle,* 379 Mass. 541, 544 (1980).

The defendant's trial counsel testified at the hearing on the defendant's motion for a new trial. He stated that he did not cross-examine Patricia Jackson with her prior inconsistent statement because it was basically consistent with her trial testimony, and he knew the prosecutor would rehabilitate the witness. He also testified that he did not probe Maupin on her involvement in the Sustakowsky murder because he thought it might reveal the defendant's involvement in other murders.

We conclude that defense counsel made sound tactical decisions not to bring out this information on cross-examination. The record reveals that defense counsel was well prepared throughout the lengthy and complex trial, and made every effort to put on the best possible defense. We agree with the judge's ruling on the motion for a new trial that defense counsel's "representation of his client was more than merely adequate. The defendant was very capably represented."

8. We have considered the defendant's claims at length, and conclude that they lack merit. After review of the entire record pursuant to G. L. c. 278, § 33E, we find no basis on which to disturb the verdict of guilty of murder in the first degree.

*Judgments affirmed.*

*Denial of motion for new trial affirmed.*