No. 84–169.   BROWN, WARDEN *v.* CHANEY.   C. A. 10th Cir. Motion of respondent for leave to proceed *in forma pauperis* granted.   Certiorari denied.

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, dissenting.

In this case, the Court of Appeals vacated respondent's death sentence because it found that the state prosecutor withheld information that might have been material to the jury's sentencing decision.   I would grant certiorari because I believe this case raises two important issues worthy of this Court's attention—how to distinguish a specific from a general request for exculpatory information, and how to determine whether withheld information was material to a sentencing decision.

I

Kendal Ashmore was a horse breeder.   On the morning of March 17, 1977, Mrs. Ashmore and her assistant, Kathy Brown, went to meet a man who had expressed an interest in Morgan horses.   Phillip Ashmore returned home from work that evening to find that his wife had not returned.   He soon received a tele-

phone call in which the caller told him that he had abducted Mrs. Ashmore and Brown. The caller demanded $½ million in $100 bills, and warned Mr. Ashmore not to tell anyone about the call. Mr. Ashmore called his attorney, who contacted the Federal Bureau of Investigation.

The next day, Mr. Ashmore gathered the ransom money. The caller again telephoned, and told Mr. Ashmore to leave the money at a specified location at a local rodeo arena or his wife would be "dead." The caller also told Mr. Ashmore that the Ashmores' truck was at 91st Street and Memorial Avenue in Tulsa. This call was traced to respondent's home phone.

Mr. Ashmore delivered the money to the predetermined spot at the rodeo grounds. Later that same day, he received a call telling him that the money had not been left in the proper place, that he should pick up the money, and try again the next day. The caller also told Mr. Ashmore that if he did not do exactly as he was told, "I'm going to send back a big hunk of your old lady in a box to you in the mail . . . ." This call was traced to a service station phone booth; the respondent's palm print was taken from the receiver handle on the telephone.

After the second call, the police set up surveillance of the respondent's home, which was about two miles from the rodeo grounds where the money was to be left. At about 3:20 a. m., the police arrested the respondent and searched his house. The bodies of Mrs. Ashmore and Brown were later found in a shallow grave on property rented by the respondent.

The respondent was indicted and tried for the murder of Mrs. Ashmore. Prior to trial, the respondent made several requests for exculpatory evidence. Only the following four were considered by the court below:

"1. Statements of all persons who have been interviewed by . . . any . . . governmental agency in connection with the subject matter of this case . . . .

"2. Stenographic recordings or transcriptions of any oral statement made by any person to . . . a member of any . . . governmental agency in connection with the subject matter of the case.

. . . . .

"4. The names and addresses of all persons who may have some knowledge of the facts involved in the instant case.

. . . . .

"13. Any and all oral statements made to . . . any . . . law enforcement official."[1]

Four FBI records were not disclosed pursuant to this request that arguably should have been. None of the withheld documents bear on the guilt or innocence of the respondent. None suggest that he was not involved in the kidnaping, and none are relevant to rebut an inference that he intended that the victims be killed.

The first, and the one considered most critical by the Tenth Circuit, is a statement made to the FBI by Ms. Poppy Weaver. Ms. Weaver said that at 4:10 on the afternoon of March 17, 1977, she was in a store parking lot in Jenks, Okla. She glanced from a distance of about eight or nine parking spaces at a blue-and-white pickup she identified as belonging to the victim. The FBI report indicates that Ms. Weaver stated that she saw Mrs. Ashmore sitting in the driver's seat, with an unidentified man and woman also in the truck. The FBI statement does not reflect the fact that Ms. Weaver later stated that she was never able to identify Mrs. Ashmore as having been in the truck.[2]

The second is a statement made to the FBI by J. C. Hamilton. Mr. Hamilton said that he saw a man get out of the Ashmore pickup truck at 91st Street and Memorial Avenue in Tulsa between 8 a. m. and 8:30 a. m. on March 18, 1977. Mr. Hamilton said he saw the man then get into a black car that was waiting there.[3]

The third is a statement by a Jenks public school student, Kyle West. The youth told the police that he saw a "shiny red" pickup truck parked at 91st Street and Memorial Avenue on the afternoon of March 17. His report said nothing about any other vehicles.[4]

---

[1] 730 F. 2d 1334, 1340 (CA10 1984) (emphasis deleted).

[2] Chaney's own attorney stated at the federal habeas hearing that Ms. Weaver told him that "she in fact did not make those statements, was not sure, and was not sure at this time, which was April of '81, nor was she sure in March of 1977 when Agent McLain talked with her." *Id.*, at 1355, n. 27. In the course of the federal habeas proceeding, the District Court stated that both the District Attorney and Chaney's counsel had indicated that Ms. Weaver had stated that she could not testify that the woman she saw on March 17 was the victim.

[3] The Tulsa County District Attorney, S. M. Fallis, testified that this information was not exculpatory because the truck was already in police custody at the time of this sighting. Fallis testified that the individual seen leaving the truck was an employee of Mr. Ashmore's. *Id.*, at 1348.

[4] Mr. Fallis explained that this statement was not exculpatory because there was no known connection between any red pickup truck and the facts of this case. *Ibid.*

The fourth is a transcription of a statement made by the victim's husband. During the first phone call from the kidnapers, Mr. Ashmore told the FBI, the caller told him: "There are four of us. We're not kidding. If your wife tries anything like that Honky that works for you, we'll do her the same way."[5]

At trial, respondent was convicted of murder and sentenced to death.[6] Although his counsel argued that unnamed accomplices might have been the actual killers, no testimony was introduced to support this claim. On appeal, the Oklahoma Court of Criminal Appeals affirmed, *Chaney* v. *State*, 612 P. 2d 269 (1980), and this Court denied the petition for a writ of certiorari. *Chaney* v. *Oklahoma*, 450 U. S. 1025 (1981).

After Chaney's direct appeals were exhausted, the four withheld documents at issue here surfaced. After two unsuccessful state-court applications for postconviction relief, Chaney sought a writ of habeas corpus from the Federal District Court, arguing that the prosecutor wrongfully withheld the requested documents. The District Court refused to grant the writ, finding that Chaney's counsel had made only a general request for exculpatory evidence, and, under the due process standard applicable to such

---

[5] Mr. Fallis testified that tapes of the other phone calls, in which the caller stated that more than one person was involved, were played to the jury. Even if exculpatory, this evidence was thus cumulative.

[6] The jury found all four aggravating circumstances argued by the State:

"1) the defendant knowingly created a great risk of death to more than one person in that he did in fact kill, without authority of law, two persons, Kendal Inez Ashmore and Kathy Ann Brown, as the evidence shows.

"2) The defendant committed the murder for remuneration or the promise of remuneration in that the evidence shows that the defendant kidnapped and killed both Kathy Ann Brown and Kendal Inez Ashmore and was attempting to extort $500,000 from the family of Kendal Inez Ashmore.

"3) The murder was especially heinous, atrocious and cruel in that the defendant bound the victims and choked them to death with pieces of cloth and buried their bodies in a shallow grave.

"4) The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution in that the evidence shows that the defendant killed the victims after kidnapping them in order to prevent them from testifying against defendant for the kidnapping charge." *Id.*, at 1352, n. 24.

At least the first two aggravating circumstances would be unaffected by a finding that Chaney was not present at the killings, so long as he intended that the victims die. The Court of Appeals did not consider Chaney's intent.

requests, the withheld evidence did not create a reasonable doubt as to Chaney's conviction or death sentence.

The Tenth Circuit reversed, and vacated the death sentence. 730 F. 2d 1334 (1984). It found that the requests for information were "as specific as possible" because Chaney did not know the names of the withheld witnesses. It then found that while the withheld evidence was not material to Chaney's conviction, it was material to the imposition of the death penalty because the withheld reports "might well have made the jurors, or one of them" doubt the prosecutor's claim that Chaney had no accomplices. *Id.*, at 1357. It found that the possibility that others were involved in the kidnaping and the killings bore on the establishment of aggravating circumstances, and constituted "important mitigating evidence."

## II

It is well settled that in certain circumstances a prosecutor is required to disclose exculpatory evidence to a defendant. *Brady* v. *Maryland*, 373 U. S. 83 (1963); *Moore* v. *Illinois*, 408 U. S. 786 (1972). In *United States* v. *Agurs*, 427 U. S. 97 (1976), this Court recognized that witholding of exculpatory testimony could arise in three different situations. The Court held that the knowing use of perjured testimony requires that the conviction be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*, at 103. The second situation involves a "specific request"—a request that gives "the prosecutor notice of exactly what the defense desire[s]"—for information in the prosecution files. *Id.*, at 106. In the face of such a request, the information should be provided either to the defense or the court if "the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists . . . ." *Ibid.* The third situation arises when only a general request or no request at all has been made, perhaps because "exculpatory information in the possession of the prosecutor" is "unknown to defense counsel." *Ibid.* In this situation, all "obviously exculpatory" evidence should be provided to the defense; if it is not, and the omitted evidence "creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id.*, at 112. The Court recognized that the prosecutor was not obligated to disclose "any information that might affect the jury's verdict," *id.*, at 108, because the Constitution "surely does

not demand" complete discovery of prosecution files as a routine practice. *Id.*, at 109.

In the context of *Agurs*, the distinction between "specific" and "general" requests seems self-explanatory. The paradigmatic "specific" request is one for statements made to police by a named accomplice. *Id.*, at 104. The paradigmatic "general" request seeks "anything exculpatory" or "all *Brady* material." *Id.*, at 106–107.

Since *Agurs*, however, courts and prosecutors have struggled to distinguish "specific" from "general" requests. Part of the problem arises because not all requests fall into obvious "specific" or "general" categories. Part of the problem arises from a tension inherent in *Agurs*' formulation: the defense must give the prosecutor notice of what is desired, but notice alone—such as notice that the defense desires every document in the prosecution's files—is not enough to overcome the prosecutor's interest in avoiding premature or excessive discovery.

Some courts have resolved this tension in a common-sense manner. They have found "specific" only those requests that give notice "of the defendant['s] interest in a *particular* piece of evidence." *Commonwealth* v. *Jackson*, 388 Mass. 98, 110, 445 N. E. 2d 1033, 1040 (1983) (emphasis added). Nor is it a "specific" request to seek statements of all persons who have been interviewed by the State but who are not expected to be called as witnesses. *Thompson* v. *Missouri*, 724 F. 2d 1314 (CA8 1984). Similarly, a request for written statements taken from any witnesses subsequent to the murder is "general." *United States ex rel. Moore* v. *Brierton*, 560 F. 2d 288 (CA7 1977).

The Court of Appeals' holding below conflicts sharply with this body of cases. It treats as "specific" those requests which seek in a blanket fashion all reports prepared by all investigatory agencies. See also *United States* v. *Warhop*, 732 F. 2d 775, 778 (CA10 1984) (request for any "F. B. I. interview statements" was "more than sufficient" to be specific) (citing opinion below). It justifies this broad right of discovery by focusing on what heretofore has been an imponderable—the defendant's ability to phrase the request more precisely.

This Court has suggested that the critical distinction does not derive from the defendant's ability to frame a more detailed request; the Court in *Agurs* understood that "exculpatory information in the possession of the prosecutor may be unknown to defense counsel." *Agurs, supra*, at 106. The Court addressed

this dilemma by requiring some information to be released when there was only a general request or no request at all. In *Agurs*, it did not matter whether the withheld information was available elsewhere; this would suggest that neither does it matter whether the request was "as specific as possible."

The opinion of the Court of Appeals conflicts squarely with those courts that have held that sweeping requests for all information in the government's files are not "specific." It conflicts fundamentally with *Agurs* by relying on the state of the defendant's knowledge; its holding has already been followed within its Circuit. The conflict at issue here deserves the attention of this Court.

III

Even if we were to agree with the Court of Appeals that the requests for information here were "specific," a substantial question still would arise as to whether the withheld information justifies setting aside the jury's sentencing decision. This Court has never applied *Brady* or *Agurs* to a sentencing decision.[7] The question of what constitutes "material" information in the context of the sentencing decision merits our attention.[8]

To decide whether the withheld information was material to the sentencing decision raises a host of questions that have never been considered by this Court. *Brady* and *Agurs* in terms do not deal with evidence on mitigating circumstances. Do the standards for reversible error that apply in the guilt phase apply unchanged in the sentencing phase, or must new standards be crafted? Should the court look to the sentence imposed in light of all the evidence, or should it look only to whether a violation occurred? Do they apply only to sentences imposed by juries, or also to sentences imposed by judges? Do *Brady* and *Agurs* apply only to capital sentencing decisions, or to all sentencing decisions?

---

[7] In *Brady*, this Court stated in dicta that withheld evidence must be produced when it is material to either guilt or punishment, but did not actually need to reach the issue because the right to a resentencing hearing was not before the Court. The Court has never commented on what would constitute "materiality" in the sentencing context.

[8] One obvious difference distinguishes the application of the "materiality" test to the sentencing phase of the trial. In the guilt phase, some evidence is not relevant to the elements of the substantive offense. In the sentencing phase, virtually all credible evidence is relevant.

In addressing these issues, the Court of Appeals held that the death penalty should be set aside because the withheld evidence "might have affected" one juror's assessment of whether mitigating circumstances existed but did not consider the overwhelming evidence that the respondent intended that the victim would be killed.[9]

The approach taken by the court below significantly alters the balance struck in *Agurs* between a prosecutor's duty to reveal exculpatory evidence and his interest in avoiding premature or excessive discovery of his files. Evidence material to mitigation is not always self-evident; here, at most, the mitigating evidence shows only that other people were involved with the respondent in a scheme to kidnap and murder two women. A prosecutor cannot

---

[9] The evidence is overwhelming both that Chaney intended that the victims would die, and that he was the actual killer. The evidence indicates that he was the caller who warned that Mrs. Ashmore would be "dead" or pieces of her body returned in a box if the ransom request was not complied with—one call was traced to his home phone; his palm print was found on the phone from which the other call was made. Other physical evidence—the contents of the victim's stomach, the length of the hair on her legs, the sharpness of the crease in her pants, the amount of makeup on her face, the condition of the gravesite—all supported an inference that she was killed within a short time of her abduction, before Chaney's arrest. Still more evidence—the theft of towels like those used in the murder from the hotel room he stayed in, his sighting near the burial scene at about the alleged time of the killing and burial, with dirt on his pants up to the knees—all constitute powerful evidence that he was involved in the actual killing.

Moreover, some of the withheld evidence supports an inference that Chaney, and not any supposed confederate, was the actual killer. Ms. Weaver reportedly told the FBI that she saw the Ashmore's pickup truck about 100 miles from the burial site on the afternoon of the kidnaping, at about the time the prosecution argued that the murder occurred. She saw three people in the truck; she ultimately could identify none of those persons as Mrs. Ashmore. At about this time, Chaney was seen near the burial site. One logical conclusion is that any supposed confederates were far from the burial site in Mrs. Ashmore's truck but without Mrs. Ashmore at the most likely time of the killings, while Chaney was near the grave. This supports, rather than contradicts, a finding that Chaney himself was the killer.

The court below did not take this evidence into account. Cf. *Strickland* v. *Washington*, 466 U. S. 668, 695 (1984) (When sentence challenged for lack of effective assistance of counsel, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death").

fairly be presumed to recognize the utility of such information to the defense. The only way a prudent prosecutor could ensure sustaining a conviction under the rule applied below is to open to the defense all files—including those files that deal with ongoing investigations into alleged accomplices. In *Agurs*, this Court explicitly held that this was not constitutionally required.

## IV

The Court of Appeals opinion highlights a conflict in the courts, and raises broad issues worthy of this Court's attention. I would grant the petition for a writ of certiorari.