COMMONWEALTH *vs.* JOSE ANIBAL COLON.

Worcester. May 9, 1990. - August 23, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence*, Admissions and confessions. *Waiver. Conflict of Interest. Attorney at Law*, Conflict of interest, Disqualification. *Practice, Criminal*, Venue, Challenge of jurors, Examination of jurors, Agreement between prosecutor and witness. *Jury and Jurors.*

The record of the hearing on a criminal defendant's motion to suppress his confession amply supported the judge's findings of fact and his conclusion that the defendant's statement was voluntarily made after a knowing and intelligent waiver of his Miranda rights. [424-426]

No substantial risk of a miscarriage of justice was demonstrated with respect to claims of inaccuracy and lack of proper authentication of a translation of a criminal defendant's confession or with respect to the alleged bias of the interpreter. [426-427]

The judge at a criminal trial correctly denied the defendant's motion to disqualify the prosecuting attorney or the district attorney's office on the ground of conflict of interest, and he correctly ordered defense counsel to withdraw for that reason and appointed new counsel. [427-432]

There was no merit to a criminal defendant's assertion that he was denied effective assistance of counsel at trial. [432-435]

At a murder trial the judge did not abuse his discretion in failing to allow the defendant's motion for a change of venue based on allegedly prejudicial pretrial publicity where there was no showing that the defendant could not receive a fair trial, and where the judge took measures to ensure that the jurors were impartial. [435-437]

At a murder trial, the judge properly denied the defendant's motion for a mistrial based on a challenge to the racial composition of the venire where the defendant offered no evidence that minorities were underrepresented or that underrepresentation was systematic. [437-439]

The judge at a murder trial correctly determined that the prosecutor's exercise of peremptory challenges was not improperly motivated by racial or ethnic considerations. [439-441]

At a murder trial the judge properly exercised his discretion to grant the defendant's request, without first conducting a colloquy with the defendant, that prospective jurors be asked questions with respect to the possibility of ethnic prejudice. [441-443]

No substantial risk of a miscarriage of justice appeared at a murder trial with respect to testimony given by a prosecution witness pursuant to a plea agreement. [443-445]

INDICTMENT found and returned in the Superior Court Department on June 14, 1983.

Pretrial motions were heard by *John J. Irwin, Jr.*, J., and the case was tried before him.

*John Salsberg* for the defendant.

*Lynn Morrill Turcotte & Julie Muse Stanley*, Assistant District Attorneys, for the Commonwealth.

ABRAMS, J. The defendant appeals from his conviction of the murder in the first degree of George L. Hanna. He claims the judge erred in (1) denying his pretrial motion to suppress his confession; (2) denying his motion to disqualify the district attorney's office from this case for a conflict of interest, and requiring withdrawal of defense counsel; (3) denying his motion for a change of venue; (4) denying his motion for a mistrial based on the composition of the venire and on the prosecutor's use of peremptory challenges; (5) failing to conduct a colloquy with the defendant prior to questioning prospective jurors on the issue of racial or ethnic bias; and (6) admitting testimony of a witness who agreed to testify in accordance with a plea agreement. The defendant also asks that we exercise our power under G. L. c. 278, § 33E (1988 ed.), and order a new trial or entry of a verdict of a lesser degree of guilt. For the reasons stated, we conclude that there is no reversible error and we affirm the conviction. We also conclude that there is no reason for us to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence on which the jury could have based their verdict. In February, 1983, the defendant had been in the continental United States for two and one-half weeks, having recently arrived in Worcester from his native

Puerto Rico. During that time, the defendant befriended Miguel Rosado. The defendant lived at 80 Chandler Street in Worcester, with his sister, Maria Figueroa and her husband, Abimael Colon-Cruz. On the morning of February 26, 1983, the defendant's girl friend of two and one-half weeks, Carmen Mangual, accompanied the defendant to his sister's (Figueroa's) apartment. Several hours later Rosado arrived. At approximately 7:30 P.M. the three men (the defendant, Rosado, and Colon-Cruz) left the apartment in Rosado's red Vega automobile to stake out a liquor store. Each man was armed with a handgun. The defendant had in his possession a .22 caliber revolver, Rosado a .32 caliber revolver, and Colon-Cruz a .45 caliber semi-automatic weapon.

On the night of February 26, 1983, Trooper George Hanna, a uniformed State police officer, was on duty in a marked State police cruiser. At approximately 8:30 P.M., Hanna was in his cruiser on Route 20 in Auburn. He activated the blue domelights and over the cruiser's loudspeaker ordered the driver of the Vega to pull into the parking lot of J & S Liquors. Hanna ordered the men out of the Vega. While he was frisking one of the men, a struggle broke out, and the defendant shot Hanna at least three times. Hanna suffered a total of seven gunshot wounds. One of the men shot one of the cruiser's tires. The men took Hanna's revolver, got into the Vega, and drove away.

John J. Richardson, Jr., was in his house behind J & S Liquors when the shooting occurred. When he heard a gunshot, he went to his door and saw three men standing near the passenger side of the Vega and Hanna standing next to the cruiser. Richardson heard another shot and saw Hanna fall to his hands and knees. Richardson went to his kitchen to telephone the police. While placing the telephone call, he looked out the window and copied down the Vega's registration number. As the Vega left the parking lot, Richardson saw Hanna get up and head toward Route 20.

John P. Iandoli, and two passengers, Edward Massei and Thomas Baker, were traveling in Iandoli's pickup truck along Route 20 toward Periwinkle's Pub. As they passed J & S

Liquors, Iandoli saw the cruiser and three Puerto Rican men standing next to the Vega. Iandoli pulled into the parking lot of the nearby Periwinkle's Pub and, finding it full, turned around and left. As he headed back toward J & S Liquors, Iandoli saw Hanna gesture for the truck to stop, and then fall in front of the truck. Iandoli also observed the Vega traveling toward Route 20 ahead of him. Iandoli stopped the truck and with the assistance of his passengers, moved Hanna to the curb. Leaving the passengers with Hanna, Iandoli got back into the truck and followed the Vega. Once behind the Vega, Iandoli wrote down the registration number. He pulled the truck up next to the car and looked at the occupants. He observed the occupants looking at him from time to time. He then returned to the scene where other police officers already had arrived. Hanna was taken to a nearby hospital where he died a short time later.

The area around the scene of the shooting was sealed off and an investigation initiated. A wallet was found containing identification belonging to Colon-Cruz and raffle tickets for the El Coqui softball team. The tickets were traced; the stubs immediately preceding the tickets found in the wallet had the defendant's name on them. Iandoli gave the police the information he had, including the Vega's registration number, which was broadcast over the police radio.

The defendant, Rosado, and Colon-Cruz arrived back at the apartment. Rosado told Mangual and Figueroa of the shooting and asked the women to go to his house and get him clothes and other items. The women left in the Vega. They were stopped by an officer searching for the Vega. Within minutes another officer arrived and the women were arrested. Iandoli was brought to observe the car, and he identified it as the same car that he had chased.

The women were taken to the Worcester police station and interviewed. Figueroa gave her consent to search her apartment at 80 Chandler Street. As the officers gathered near the apartment, one of them observed an automobile pass by, occupied by three Hispanic men and one woman. Because the license plate was not illuminated, one of the officers followed

the car. The officer attempted to stop it by activating the cruiser's blue lights. The car did not stop. One of the occupants repeatedly looked back at the cruiser and then turned forward. Eventually, the car pulled over to the side of the road. As the officer pulled his cruiser behind the car, the driver got out and walked toward the cruiser. The officer ordered him back into the car. The officer and his partner approached the car, one on either side, and asked the occupants for identification. The man in the back seat replied that he had none, and the man in the front passenger seat identified himself as "Jose Colon." It was later determined that he was Abimael Colon-Cruz, not the defendant. The officer recognized the name as that of one of the suspects they were searching for and told his partner to watch the man. Turning to the man in the back seat, the officer noticed a bulge in the man's back left pocket. Not knowing what the object was, the officer removed it and discovered that it was a wallet. The wallet contained a hospital card with the name Miguel Rosado Cruz. The officers called for backup assistance.

Two other State troopers arrived. Trooper Joseph Flaherty opened the passenger side of the car and the man sitting in the seat, Colon-Cruz, slid over to the driver's side. Flaherty saw a brown bag, similar to a bowling bag, on the floor between Colon-Cruz's legs. As Flaherty pulled the bag toward him, the zipper opened revealing two handguns, one of which he identified immediately as a State police .357 magnum. Searching the bag further, he found three other handguns, a .45 caliber, a .32 caliber, and a .22 caliber. Colon-Cruz and Rosado were arrested.

As a result of information received by the police, police officers went to an apartment at 271 Constitution Avenue in Worcester, in search of the defendant. The officers identified themselves to residents and obtained consent to search for the defendant, who was found in a second floor bedroom. After a struggle, see *infra* at 424, the defendant was arrested. The defendant made a statement while in police custody. See *infra* at 425. We turn to the defendant's claim that the judge

erred in denying his motion to suppress the statement he made to the police.

1. *The defendant's statement to the police.* Following his arrest, the defendant was questioned by the police. One of the troopers who questioned the defendant acted as a translator, because the defendant spoke no English. The defendant moved before trial to suppress his statement on the ground that the statement was coerced and not the product of a knowing and intelligent waiver of the rights protected by the Miranda warnings. See *Miranda* v. *Arizona,* 384 U.S. 436, 475 (1966). On appeal, he also argues that the translator was unqualified and biased and that the statement was not properly authenticated. We discuss these issues in turn.

(a) *Voluntariness of the statement.* We summarize the trial judge's findings. On February 27, 1983, after receiving information concerning the defendant's whereabouts, a contingent of State troopers went to arrest the defendant. The defendant attempted to flee, but two officers seized him and, with some difficulty, forced him to the floor. The defendant struggled considerably. The police subdued the defendant enough to handcuff him. As the defendant continued to struggle, the officers carried him down the stairs of the apartment to a police cruiser. The police took the defendant to the Worcester police department shortly after 1:30 P.M. and placed him in an interview room with Troopers Paul McDonald, Thomas Farrell, and Elliot Matos, who acted as an interpreter.[1]

At the beginning of the interview, Matos identified himself to the defendant and told the defendant that he would "read him his rights" as soon as a Spanish Miranda card was located. No questions were asked while the troopers sought to obtain a Spanish Miranda card. After the troopers found one, Matos read it to the defendant line by line, asking the defendant whether he understood each of the rights. The de-

---

[1]On arrival at the police station, the defendant appeared to have dried blood near his nostrils. He also was shirtless, but during the interview, he was provided with a shirt by a police officer. During the interview, when the defendant complained of a headache, he was given aspirin.

fendant indicated that he did understand them but was willing to waive them and submit to questioning.

The procedure followed during the interview was as follows. Farrell and McDonald asked questions in English; Matos translated the questions into Spanish; the defendant replied in Spanish; and Matos repeated the defendant's reply in Spanish and then translated it into English. After some questioning in this fashion had occurred, McDonald and Farrell concluded that the defendant was not answering truthfully. Accordingly, they asked Matos to inform the defendant that if he did not want to tell the truth, there was no point in continuing the interview. McDonald and Farrell left the room.

The defendant then told Matos that he was ready to tell the truth. After approximately five minutes, the other officers returned. McDonald took the defendant's statement by writing down the questions asked of the defendant and the answers received from the defendant through Matos. At the end of the interview, Matos told the defendant that he would read him the statement in Spanish, so that the defendant could correct any errors, but the defendant declined the offer. The defendant signed the statement, using the name Jose William Hernandez. The defendant then was taken to the booking area, where he was presented with a photocopy of a Spanish Miranda card and was asked to sign. After complaining of chest pains, he initialed the card and was taken to Worcester City Hospital.

The defendant testified at the motion hearing that he was beaten by the troopers who arrested him, that he was thrown down a flight of stairs after being handcuffed, that he was beaten while being transported to the police station, and that he was again beaten during the custodial interrogation. The judge discredited the defendant's testimony on this point, because "the medical report [taken at Worcester City Hospital] disclosed that no visible signs of physical injury were present." The judge found that "the defendant's waiver was made knowingly, voluntarily and intelligently," and that the defendant was "not beaten . . . [n]or was a statement invol-

untarily coerced from him. . . . The evidence presented during the hearing indicates that the law enforcement officials accorded the defendant proper treatment." The judge found that the dried blood near the defendant's nostrils was the result of the defendant's attempt to resist arrest. The judge determined that "there was no evidence . . . that the defendant suffered from drunkenness, drug influence, [or] mental incompetency," and concluded that the defendant's complaints of headache and chest pains "did not preclude the defendant from responding intelligently." Accordingly, the judge denied the motion to suppress.

"In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). Accord *Commonwealth* v. *Cunningham,* 405 Mass. 646, 655 (1989); *Commonwealth* v. *Melvin,* 399 Mass. 201, 204 (1987). The record amply supports the judge's subsidiary findings of fact and his conclusion that the defendant's statement was voluntarily made after a knowing and intelligent waiver of the rights protected by the Miranda warnings. The judge was entitled to discredit the defendant's testimony at the motion hearing. "The clear error standard is a very limited form of review. . . . Where there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted." *Yesilciman, supra* at 743, quoting *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984). The defendant's protestations concerning his inability to speak English and his unfamiliarity with his setting are insufficient to cast doubt on the judge's findings on the issue of voluntariness. See *Commonwealth* v. *Pares-Ramirez,* 400 Mass. 604, 607 (1987). Cf. *Commonwealth* v. *Garcia,* 379 Mass. 422, 428-431 (1980). There was no error in denying the motion to suppress on this ground.

On appeal, the bulk of the defendant's argument concerning the voluntariness of his statement is a preview of his arguments concerning the accuracy of Matos's translation of

the statement and the claimed failure to authenticate the statement.

(b) *Accuracy, authentication, and bias.* The defendant makes a host of interrelated arguments concerning the statement translated by Matos and transcribed by McDonald. We note, however, that the defendant's argument at the suppression hearing was limited to the issue of voluntariness of the confession, see part 1 (a), *supra.* Because "the defendant gave the motion judge no hint of the argument he presents here . . . we should not consider the argument on appeal." *Commonwealth* v. *Pares-Ramirez,* 400 Mass. 604, 609 (1987). Accord *Commonwealth* v. *Assad,* 393 Mass. 418, 423 (1984); *Commonwealth* v. *Lett,* 393 Mass. 141, 144 (1984). We therefore confine our inquiry to the question whether the failure to suppress the defendant's statement on these grounds created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 746 (1990); G. L. c. 278, § 33E.

The defendant's objections to Matos's qualifications to interpret are without merit. Matos testified at the suppression hearing that he was born in Puerto Rico, that Spanish was his first language, and that his family still spoke Spanish among themselves. He also said that he had been educated in the United States and had acted as an interpreter for the Department of Correction. At the motion hearing, the defendant recounted his conversation with Matos (although his account of the substance of what was said differed materially from Matos's account of the same conversation). The defendant also admitted that he did understand Matos. Thus, we conclude that Matos was sufficiently qualified as an interpreter, and that there was no substantial likelihood of a miscarriage of justice.

The defendant also claims that the written confession was not properly authenticated. At the motion hearing, however, McDonald identified the document as his own handwritten notes of the interview. Matos also testified at the motion hearing concerning the genuineness of the document and the accuracy of its contents. On cross-examination, Matos was

asked, "Have you compared the statement presented into evidence today with your memory of what was said in that afternoon?" Matos responded affirmatively. Later in the hearing, the motion judge asked, "Does that [statement] fairly reflect the questions and answers . . . that you recall having been presented to [the defendant], through you . . . ?" Matos replied, "Yes, sir. I carefully went over that statement . . . after it was typed out, and took a long time in doing that, and it is a fair and accurate account."[2] The judge asked, "It is a fair and accurate account of the questions that are contained therein, and the answers that [the defendant] gave you?" Matos replied affirmatively. This testimony leaves little doubt concerning the genuineness of the document. Justice did not miscarry on this score.

The defendant's complaint that Matos was biased does not trouble us. Indeed, we have refused to consider precisely this issue in the past when a defendant failed to bring it to the attention of the motion judge. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987). Nevertheless, pursuant to our duty under G. L. c. 278, § 33E, we briefly consider whether any possible bias on the part of Matos when he translated the defendant's statement created a substantial likelihood of a miscarriage of justice. Bias is an issue for the jury, see *Commonwealth* v. *Ahearn*, 370 Mass. 283 (1976), and at trial, defense counsel cross-examined Matos in a manner that put the jury on notice that the accuracy of Matos's translation was at issue. Defense counsel asked Matos, "When [the defendant] said, I'll talk to you, did you understand that to mean he would talk . . . with the other troopers that were in the room?" Matos replied that the defendant "would be speaking with the three of us, sir." Counsel con-

---

[2]By the time of trial, Matos had no recollection of the statement. The judge admitted the statement in evidence. McDonald identified his handwritten notes of the interrogation. See, e.g., *Commonwealth* v. *Bookman*, 386 Mass. 657, 663 (1982) ("[T]he well-established rule in this Commonwealth [is] that a witness may incorporate past recollection recorded in his testimony, or, in the discretion of the judge, the memorandum may be admitted in evidence").

tinued, "So you understood your role . . . as a participant and not merely as a voice?" Matos responded affirmatively. In response to further questions concerning whether Matos regarded himself as merely an impartial translator or as a State trooper actively involved in the investigation, Matos replied, "I made no judgment, sir. I believe I was — It's hard to answer the question, sir." This exchange was sufficient to alert the jury that Matos may have had some bias that could have affected the translation. Accordingly, we conclude that there was no substantial likelihood of a miscarriage of justice. See *Yesilciman, supra* at 746; G. L. c. 278, § 33E.

· 2. *Denial of the defendant's motion to disqualify the district attorney's office.* Dennis Brennan was the defendant's attorney for all pretrial proceedings and for an interlocutory appeal, see *Commonwealth* v. *Colon-Cruz*, 393 Mass. 150 (1984). Mr. Brennan was a member of the firm McGuire & McGuire, as was Attorney Penelope Kathiwala.[3] On June 23, 1983, Ms. Kathiwala appeared for Mr. Brennan at the · defendant's arraignment. Assistant district attorney Louis P. Aloise appeared for the Commonwealth. Later that day, Mr. Aloise asked Ms. Kathiwala to represent him in a tort action. Mr. Brennan was unaware of the fact that his associate had undertaken to represent the assistant district attorney. In March, 1984, Ms. Kathiwala accepted employment from the district attorney for the Middle District, John J. Conte, Mr. Aloise's superior, who retained her to draft a will. In October, 1984, Ms. Kathiwala also undertook to represent Mr. Aloise again in connection with a contract matter. Shortly before trial in this case, in early February, 1985, Mr. Brennan learned of Ms. Kathiwala's employment by members of the district attorney's office and filed a motion to "strike appearance of A.D.A. Louis P. Aloise and to determine whether to disqualify the office of the District Attorney for the Middle District." The defendant now argues that the de-

---

[3]On this record, McGuire & McGuire appears to be a cost sharing arrangement. The various attorneys practice together and hold themselves out to the public as a firm, although they merely share the expenses of operating a law office.

nial of this motion was error, and that the judge's action in requiring Mr. Brennan to withdraw and in appointing new counsel forty-one days before trial resulted in the denial of his constitutional right to counsel. We disagree.

In materials submitted to the court on the instant motion to disqualify the district attorney's office, Mr. Brennan candidly recognized the conflict created by Ms. Kathiwala's actions.[4] In one affidavit, he recounted a conversation with Ms. Kathiwala, in which, after discovering that she had undertaken to represent Mr. Aloise, he stated, "I won't be able to try this case." He also recalled attempting to dissuade Ms. Kathiwala from representing the district attorney by pointing out to her that, were she to accept the employment, "my representation in the Hanna case will be compromised."[5] Nevertheless, instead of withdrawing after his discovery of the conflict, Mr. Brennan submitted the motion now before us.

Clearly, there was no reason for the trial judge to disqualify either the assistant district attorney or the entire district attorney's office. The conflict lay with Mr. Brennan and Ms. Kathiwala, as Brennan recognized, and not with members of the district attorney's office. See *Commonwealth v. Hodge*, 386 Mass. 165 (1982) (genuine conflict of interest existed when law partner of defendant's trial attorney concurrently represented a prosecution witness in an unrelated civil matter); *Commonwealth v. Geraway*, 364 Mass. 168 (1973) (where associates of defendant's trial attorney represented prosecution witnesses in several unrelated matters, genuine conflict of interest arose). Thus, it was entirely proper for the judge to require Mr. Brennan to withdraw and to appoint other counsel for the defendant, particularly because the de-

---

[4]See S.J.C. Rule 3:07, Canon 5, DR 5-105 (D), 382 Mass. 779, 782 (1981), then in effect, which provided, in part: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate or any other lawyer affiliated with him or his firm may accept or continue such employment."

[5]We reiterate the "necessity of the institution by counsel of adequate checking arrangements to prevent a situation similar to that which obtained here." *Commonwealth v. Geraway*, 364 Mass. 168, 175 (1973).

fendant, when apprised of the situation, demanded Mr. Brennan's withdrawal.

Nothing in the record supports the defendant's argument that the district attorney's office had a conflict of any kind. Generally, conflicts on the part of a district attorney arise when the prosecutor formerly was employed by the defendant or when the prosecutor's freedom from private influence is in question. See, e.g., *Pisa* v. *Commonwealth*, 378 Mass. 724, 726 (1979) ("having participated in the preparation of the defendant's case, [a lawyer] could not properly participate in the prosecution of the defendant"); *Commonwealth* v. *Tabor*, 376 Mass. 811 (1978) (where the prosecutor in a murder case was counsel for the victim's widow in proceedings to recover crime victim's compensation, the prosecutor's impartiality was compromised and the defendant was entitled to a new trial). See also *United States* v. *Caggiano*, 660 F.2d 184 (6th Cir. 1981) (trial judge erred in disqualifying entire prosecutor's office in case in which one assistant United States attorney formerly had represented defendant), cert. denied, 454 U.S. 1149 (1982), and 455 U.S. 945 (1982). Nothing of the kind is present here. As Ms. Kathiwala's clients, Mr. Aloise and Mr. Conte had no dual role that would compromise *their* obligation to remain free from "private interests and from private influence" and to "secure a fair and impartial trial for the public and for the defendant." *Tabor*, *supra* at 819.

The defendant, however, argues that disqualification of the district attorney's office was necessary, because in seeking out Ms. Kathiwala to represent him, Mr. Aloise intentionally and unfairly created the conflict that resulted in Mr. Brennan's withdrawal. See *Commonwealth* v. *Manning*, 373 Mass. 438 (1977). See also *Commonwealth* v. *Cinelli*, 389 Mass. 197, cert. denied, 464 U.S. 860 (1983). This argument is without merit. Although we have dismissed indictments when members of the prosecution team wilfully interfered with a defendant's constitutional right to counsel, see *Manning*, *supra*, the prosecution's conduct in this case was wholly devoid of the intentional, egregious misconduct present in

*Manning.* There, Federal officers working closely with the
State prosecutor deliberately and intentionally attacked the
relationship between the defendant and his counsel in a cal-
culated effort to induce him to abandon his defense. The rec-
ord does not support an inference that the prosecutors re-
tained Ms. Kathiwala with the intention of interfering with
the attorney-client relationship between Mr. Brennan and the
defendant. There was no error in denying the motion to dis-
qualify the district attorney's office.

The defendant further argues that the appointment of
counsel in place of Mr. Brennan forty-one days before trial
resulted in ineffective assistance of counsel. "When faced
with a claim of ineffective assistance of counsel, we have
stated that the court must undertake 'a discerning examina-
tion and appraisal of the specific circumstances of the given
case to see whether there has been serious incompetency,
inefficiency, or inattention of counsel — behavior of counsel
falling measurably below that which might be expected from
an ordinary fallible lawyer — and, if that is found, then, typ-
ically, whether it has likely deprived the defendant of an oth-
erwise available, substantial ground of defence.'" *Common-
wealth* v. *Lykus*, 406 Mass. 135, 139 (1989), quoting
*Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See
*Commonwealth* v. *Mamay*, 407 Mass. 412, 423 (1990). The
performance of the able and experienced attorney appointed
by the judge was well above this standard.[6]

The defendant argues that counsel's performance reveals a
"lack of familiarity with the facts" that was "reflective of
lack of preparation inherent in such a short time span" as
the forty-one days successor counsel had to prepare the case.
We have read the entire record and consider counsel's famili-
arity and preparation to be more than adequate. Moreover,
"[e]ven if a defendant demonstrates a deficiency in pretrial

---

[6]We note that successor defense counsel, a former president of the
Worcester County Bar Association, had extensive experience in criminal
law and had participated in nine first degree murder proceedings. Counsel
agreed to set aside all other matters in his practice in order to give this
case his full attention.

preparation, 'the defendant [can] make no headway in the absence of a showing that the fault probably resulted in forfeiture of a substantial defence.' " *Commonwealth* v. *Sellon*, 380 Mass. 220, 227 (1980), quoting *Saferian, supra* at 98.

The defendant faults counsel's cross-examination of three "key" witnesses and asserts that counsel's performance "amounted to a concession of the case."[7] We disagree. With respect to counsel's cross-examination of Iandoli, the defendant objects to counsel's failure to explore various pretrial matters involving Iandoli's identification of the defendant. Although counsel did not retrace Iandoli's every appearance in pretrial proceedings, counsel did focus effectively on the principal issue, the reliability of an identification, made from a vehicle moving at high speed, of suspects fleeing from a crime scene in another vehicle. Certainly, it cannot be said that the focus of the cross-examination was "manifestly unreasonable." *Commonwealth* v. *Callahan*, 401 Mass. 627, 636 (1988). "When the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.' " *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979), quoting *Commonwealth* v. *Stone*, 366 Mass. 506, 517 (1974).[8] Nor was it unreasonable for counsel not to

---

[7] The defendant's principal brief was largely devoid of references to the record and citations to authority on this point. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). The defendant's reply brief corrects this deficiency.

[8] The defendant complains that, in his closing, defense counsel referred to Iandoli as "heroic" and "not a liar." This was not an unreasonable tactic. Although counsel referred to the witness as a hero, he vigorously argued that the witness made a mistake in his identification. In the course of his attack on the witness's identification, defense counsel argued that the witness got "caught up in the excitement of the thing" and went a "step or two too far." He argued that the witness said "nothing about being able to identify anyone"; that the witness said he could not identify the passenger; that the witness was mistaken and was "perceiv[ing] that which the [investigators wanted him] to perceive"; that the jurors should consider the speed of the vehicles, the limited opportunity to observe persons in the Vega, and should take the witness's view with a "grain of salt." The fact that appellate counsel would have said that the witness was a liar does not

call an expert on the issue of the potential unreliability of Iandoli's identifications. There was no need for an expert on this matter; it was not beyond the ordinary knowledge and experience of the jurors. See *Commonwealth* v. *Jones*, 362 Mass. 497, 501-502 (1972).

The defendant's criticism of the cross-examination of Mangual also is without merit. The defendant's claim that counsel did not focus on Mangual's agreement to testify and her incentives to please the prosecution is unsupported by the record. See *infra* at 443-445. Nor was defense counsel required to explore the details of every prior statement Mangual had made; he made the point by repeatedly eliciting admissions that her prior statements were lies. The defendant's objection to the fact that counsel elicited information from Mangual about the defendant's consumption of drugs and alcohol shortly before the crime also is without merit. He contends that this information "portrayed [him] as an out-of-control substance abuser." Defense counsel used the testimony as the basis for a requested instruction. See *Commonwealth* v. *Perry*, 385 Mass. 639 (1982); *Commonwealth* v. *Gould*, 380 Mass. 672 (1980). The judge did so instruct. Cf. *Commonwealth* v. *Street*, 388 Mass. 281 (1983); *Commonwealth* v. *Westmoreland*, 388 Mass. 269 (1983). Rather than leaving the defendant with no defense, defense counsel raised the issue of mental impairment due to voluntary intoxication by either drugs or alcohol for the jurors' determination. Further, cross-examination brought out the fact that the witness was an admitted convicted heroin dealer and that in testifying against the defendant the witness was getting "a deal." Nothing in this effective cross-examination could be characterized as manifestly unreasonable. See *Commonwealth* v. *Fuller*, 394 Mass. 251, 258 (1985).

Finally, as to the defendant's retrospective criticism of counsel's cross-examination of Matos, we consider it utterly without merit, and indeed, largely unsupported by the rec-

---

mean that it was unreasonable for trial counsel to argue that the witness merely was mistaken.

ord. Counsel's performance in these three cross-examinations
certainly was not "measurably below that which might be
expected from an ordinary fallible lawyer," *Saferian, supra*
at 96, nor did it leave the defendant "denuded of a defense."
*Commonwealth* v. *Street, supra* at 287. Accordingly, we con-
clude that the trial judge's denial of the motion to disqualify
the district attorney's office and the judge's appointment of
new counsel forty-one days before trial did not result in a
denial of the defendant's constitutional right to the effective
assistance of counsel. See *Saferian, supra.*

3. *Change of venue.* Before trial, the defendant moved for
a change of venue based on allegedly prejudicial pretrial
publicity. On appeal, the defendant argues that the judge
erred in denying his motion and violated his constitutional
right to a fair and impartial trial.[9] He claims that, because of
allegedly prejudicial and widespread pretrial publicity con-
cerning his case, a fair trial and unbiased jury could not have
been obtained.

"The decision whether to grant . . . a motion for a change
of venue on the basis of pretrial publicity lies within the dis-
cretion of the trial judge." *Commonwealth* v. *Bianco,* 388
Mass. 358, 367 (1983), citing *Commonwealth* v. *Blackburn,*
354 Mass. 200, 203-205 (1968). The judge did not abuse his
discretion in failing to order a change of venue, nor did he
violate the defendant's right to a fair trial.

A judge should allow a motion to change venue "only after
a solid foundation of fact has been first established." *Com-
monwealth* v. *Smith,* 357 Mass. 168, 173 (1970), quoting
*Crocker* v. *Superior Court,* 208 Mass. 162, 180 (1911). The
defendant did not establish such a foundation in this case.

---

[9]Contrary to the reference in the defendant's argument, the judge did
not deny the motion. Rather, after hearing, the judge took the motion
under advisement, pending results of the jury selection. Sixteen jurors sub-
sequently were empanelled. Trial counsel did not renew the motion and the
judge never acted on the motion. The Commonwealth argues that the de-
fendant's failure to renew the motion limits appellate review to a determi-
nation whether there exists a substantial risk of a miscarriage of justice.
See *Commonwealth* v. *Silva,* 401 Mass. 318, 329-330 (1987).

*Smith, supra,* and cases cited. The defendant presented no evidence to the judge showing that he could not receive a fair trial without a change of venue.[10] Indeed, at the hearing held on the motion, trial counsel said: "[W]e have presented no factual evidence to the court to indicate that the defendant will not receive a fair trial in Worcester or impartial trial, and in fact there is no way I can produce any evidence to suggest to the court that he will not. . . . I think [the prosecutor] and I have both anticipated a problem in selecting jurors just because of the publicity and the fact of the sequestration. . . . I would suggest that, while presenting [the motion] to the court today, you might want to consider deferring it to the time that we start to empanel and, if we have the problem that [the prosecutor] and I are anticipating, perhaps you could just defer any action on that for today until we see what happens with the jurors." Trial counsel and the prosecutor agreed to wait and see if they encountered any difficulty empanelling jurors who were not prejudiced by pretrial publicity. The judge took the motion under advisement.

The judge took measures to ensure that the defendant would receive "a trial by an impartial jury free from outside influences." *Commonwealth* v. *Vitello,* 367 Mass. 224, 236 (1975), and cases cited. He conducted an individual voir dire of each prospective juror and screened out any person who might have been prejudiced by pretrial publicity. See *Commonwealth* v. *Bianco,* 388 Mass. 358, 368 (1983); *Commonwealth* v. *Jackson,* 388 Mass. 98, 109 (1983); *Commonwealth* v. *Gilday,* 367 Mass. 474, 492 (1975). The judge

---

[10]In the record appendix prepared for this appeal, the defendant includes a number of newspaper articles pertaining to his case. Those articles do not establish that the jury was not impartial and that the defendant was denied a fair trial. "The existence of pretrial publicity does not alone indicate that an impartial jury cannot be empanelled." *Commonwealth* v. *Jackson,* 388 Mass. 98, 108 (1983), and cases cited. See *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 (1975). Review of the voir dire of prospective jurors demonstrates that there were a number of prospective jurors who appeared to be impartial after a voir dire interrogation by the judge.

sequestered the jury after empanelling. See *id.* at 492. The judge was within his discretion to conclude that the jurors who were seated were disinterested. See *id.* Moreover, as jurors were seated, trial counsel stated that he was "content" or expressed no dissatisfaction with the jurors, see *Commonwealth* v. *Smith*, 357 Mass. 168, 173 (1970), and he did not exhaust his peremptory challenges. See *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 532 (1975).

4. *Composition of the venire and the Commonwealth's use of peremptory challenges.* The defendant argues that the trial judge erred in denying his motion for a mistrial, which challenged the racial composition of the venire and the Commonwealth's use of peremptory challenges. We conclude that the judge committed no error in denying the motion.

In challenging the venire, the defendant argues that the racial composition of the venire was "grossly" underrepresentative "of minority group members in the community, in violation of the constitutional requirement that a fair jury be drawn from a representative cross-section of the community." In order to show that the petit jury was not drawn from a fair cross-section of the community, the defendant bears the burden of establishing "that (1) the group allegedly discriminated against is a 'distinctive' group in the community, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the community, and (3) that the underrepresentation is due to systematic exclusion of the group in the jury selection process." *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96-97 (1980), citing *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979). The judge rejected the defendant's argument as a ground for mistrial, finding that " 'although the defendant alleges exclusion of an undeniably distinctive group, he has offered no evidence that the representation was disproportionate to the number of [minorities] in [Worcester] County, or more significantly, that underrepresentation was systematic.' *Commonwealth* v. *[Williams]*, 378 Mass. 217, 221 (1979)." There was no error.

The judge found that Worcester county, where the defendant was tried, employed the so-called Middlesex county "one day, one trial" system whereby every eligible person in the county must appear for jury duty on an assigned day. Pursuant to that system, each city and town in the county submits an annual census list of its residents to the office of the jury commissioner. Those lists are entered into a computer, which randomly sorts the names. A certain percentage of names are included on a yearly master list, from which a number of jurors again are randomly selected by computer for each day of the year. See generally G. L. c. 234, §§ 1-41, and G. L. c. 234A, §§ 1-80 (1988 ed.). The judge concluded that the system used "contains no element of subjectivity in the compilation of the venire." We agree. "The [Worcester] County selection procedure has much to commend it for its assurance of randomness in the selection process." *Bastarche, supra* at 90-91, n.2.

The defendant offered no evidence of the composition of any past venires. See *Commonwealth v. Peters*, 372 Mass. 319, 323 (1977). He did offer statistics from the 1980 Federal Census showing that the total minority population of Worcester county was 3.8%. The defendant notes that for the first two days of jury selection, the venires consisted of 289 people. Of those, he claims that there were no Asians, one Hispanic, and one black.[11] Thus, minorities constituted .7% of the two venires. The judge concluded that the statistical showing "did not rise to the level of a showing of purposeful systematic exclusion of minorities in the venire." See *Commonwealth v. Williams*, 364 Mass. 145, 149 (1973) (no error in judge's refusal to dismiss indictment where only one

---

[11]Defense counsel relied on his own visual observations of the venires in making his determination that only two persons in two days (and four in three days) were black, and on surnames for the identification of persons of Hispanic origin. The judge concluded that that type of evidence was "an insufficient basis for any showing of discriminatory practices." We agree. Cf. *Commonwealth v. Peters*, 372 Mass. 319, 322 (1977) (one cannot draw reliable inferences about the composition of the venire from a list with short catchphrases about each person making up the venire).

of 121 persons on venire was black). See also *United States v. Hafen*, 726 F.2d 21, 23 (1st Cir.), cert. denied, 466 U.S. 962 (1984); *United States v. Clifford*, 640 F.2d 150 (8th Cir. 1981).

The defendant's second ground for a mistrial was that the Commonwealth systematically used peremptory challenges to eliminate all minority groups from the jury, thereby depriving the defendant of his constitutional right to a fair trial and impartial jury. The defendant, an Hispanic, was convicted by a jury without any Hispanic or black jurors. The defendant asserts that, in this case, the allegation was that Hispanic men killed a white police officer. He asserts that "[t]here is a great likelihood that prospective jurors were challenged solely because of race or ethnicity" and concludes that, "[i]n light of all the circumstances, the only plausible reason for challenging these particular individuals was that they were Hispanic or black."[12]

There is a presumption that peremptory challenges are properly used. See *Commonwealth v. Soares*, 377 Mass. 461, 489, cert. denied, 444 U.S. 881 (1979). The presumption may be rebutted by "showing that (1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury *solely* by reason of their group membership" (emphasis supplied). *Soares, supra* at 489-490. "It is for the trial judge to 'determine whether to draw the reasonable inference that peremptory challenges have been exercised so as

---

[12]The defendant claims that the prosecutor had an opportunity to clarify any uncertainties he had regarding the impartiality of the minority members of the venire, but declined to do so, thus ensuring that they would not be able to explain their situations. He asserts that the prosecutor engaged in extensive voir dire questioning of white jurors when a question of impartiality or bias was raised, but that the Commonwealth "decline[d] to give any of the minority veniremen an opportunity to elaborate on the matters which the Commonwealth ultimately claimed to make them unacceptable." The record flatly refutes the defendant's assertion. The Commonwealth thoroughly questioned the three challenged minority members of the venire regarding their impartiality.

to exclude individuals on account of their group affiliation.' "
*Commonwealth* v. *Walker*, 379 Mass. 297, 301 (1979), quot-
ing *Soares, supra* at 490, 492 n.37. "[W]e do not substitute
our judgment for his if there is support for it on the record."
*Commonwealth* v. *DiMatteo*, 12 Mass. App. Ct. 547, 552
(1981), and cases cited. The judge found that the evidence
presented by the defendant was not sufficient to rebut the
presumption and that no reasonable inference could be
drawn that the Commonwealth's peremptory challenges were
exercised "so as to exclude individuals on account of their
group affiliation." *Soares, supra* at 490, 492 n.37. See
*Walker, supra* at 301. The record supports the judge's find-
ings. There was no error.

The record shows that the prosecutor challenged three po-
tential jurors, one person with an Hispanic surname and two
black persons and stated for the record his reasons for chal-
lenging each juror.[13] The defendant argues that "the prose-
cution gave thinly disguised excuses for excluding [the] mi-
nority group members." We do not agree. The Common-
wealth challenged the Hispanic surnamed juror because he
was employed in the Probate Court in the same courthouse
where the defendant was being tried and might have been
exposed to the defendant's case, as well as to defense counsel,
who was a local attorney. Indeed, the juror said that he knew
the defendant's trial counsel "as an attorney from working
downstairs." The prosecutor challenged a black juror because
he was acquainted with one of the police officer witnesses in
the case and because, in 1982-1983, the juror previously had

---

[13]The judge also found that, "assuming for the sake of argument, that
the defendant has rebutted the presumption, I find that the Common-
wealth clearly stated on the record its reasons for challenging each one of
these jurors, and thus, met its burden of demonstrating that jurors were
not excused because of their membership in a particular group, race, or
class," comparing *Commonwealth* v. *Smith*, 12 Mass. App. Ct. 667, 675-
676 (1981), and *Walker, supra* at 297, with *Soares, supra*, and *Common-
wealth* v. *Brown*, 11 Mass. App. Ct. 288, 290 (1981). See *Soares, supra* at
491.

been involved with an investigation that led to the conviction of Worcester police officers in an unrelated matter.[14]

The prosecutor challenged a second black juror, stating that he did so because the juror's stepbrother had been convicted of a violent crime two years before and the juror himself had been involved in criminal matters at least seven to nine times between 1969 and 1979, which he neglected to mention on the jury questionnaire. On oral examination, the juror explained that he "forgot" about his prior involvement with the judicial system.[15] The judge's determination that the prosecutor's exercise of the peremptory challenges was not racially motivated is supported by the record.

5. *The judge's failure to conduct a colloquy with the defendant prior to voir dire inquiry of individual jurors regarding ethnic bias.* Prior to jury selection, the defendant moved that the judge inquire of prospective jurors as to the possibility of prejudice against persons of Puerto Rican or Hispanic origin. The judge granted the motion and posed several questions on an individual voir dire basis.[16] The judge

---

[14]The Commonwealth did not challenge a white juror who previously had been represented by an attorney in the same firm as defense counsel. The defendant argues that "[t]his Court should not credit the prosecutor's purported reasons for his challenges, especially when the prosecution regarded a relationship as intimate as that between an attorney and his client as acceptable, while objecting to tenuous relationships in which the potential juror only knew the name of a witness or the defendant's lawyer." The defendant misstates the record. The white juror had not been in an attorney-client relationship with defense counsel. On oral examination, he clearly stated that he did not even know defense counsel. The challenged jurors were acquainted with either potential witnesses or defense counsel.

[15]The defendant asserts that the challenged black juror "was not unlike" a previously accepted white juror whose brother had a criminal conviction for assaulting a police officer. We do not agree. The challenged juror was quite different because he had a ten-year criminal record which he had failed to disclose. Moreover, the Commonwealth also challenged a white juror who had a prior conviction for possession of fireworks and an outstanding arrest warrant for speeding.

[16]The judge asked the following questions: "[T]he defendant in this case speaks very little English. He is of Hispanic origin and is Puerto Rican by birth. . . . Will the fact that the defendant is Hispanic or Puerto Rican and able to communicate effectively only in Spanish influence you in any way

did not conduct a colloquy with the defendant before posing the questions. The defendant now argues that "the trial judge's failure to conduct a colloquy with the defendant to ascertain whether the defendant knowingly and voluntarily consented to the judge's questioning of prospective jurors on the issue of possible racial bias was prejudicial error."[17] Relying on *Commonwealth v. De La Cruz*, 405 Mass. 269 (1989), the defendant asserts that "the trial judge was required to conduct a colloquy with the defendant before questioning prospective jurors with respect to possible bias against Hispanic persons." We do not agree. After the briefs in this case were filed, we decided that a judge may conduct a voir dire of prospective jurors on the question of racial or ethnic bias without first conducting a colloquy with the defendant. See *Commonwealth v. Ramirez*, 407 Mass. 553, 554-557 (1990). It was within the discretion of the judge to grant the defendant's request for "individual voir dire as to possible juror prejudice based on ethnic considerations," *De*

---

against him? . . . In your personal life, do you consciously or subconsciously harbor any private prejudices with respect to people of Hispanic origin? . . . With respect to this defendant, would you be prejudiced one way or another against him or for him because of his origin? . . . So do I understand that you would not in any way consider his race or his ethnic origins in terms of whether or not he is ultimately innocent or guilty of this particular crime?"

In his reply brief, the defendant argues that, by asking the last question, the judge "implied to the jury that the defendant's 'race' was an issue, where this Court [stated in *Commonwealth v. De La Cruz*, 405 Mass. 269, 272 (1989)] that Caucasian Hispanics are Caucasian, and not a separate race." Citing to no authority, he claims that "[t]he defendant should have been asked if this incorrect characterization of his race should have been put before the jury." The question did not make any "characterization" regarding the defendant's race, let alone an "incorrect" characterization.

[17]Contrary to the defendant's argument, the case does not present an "issue of possible racial bias." Rather, "this case involves a defendant and [a] . . . victim of different ethnic backgrounds, not of different races in the traditional sense. The word 'Hispanic,' ordinarily refers, not to race, but to national origin. See *Commonwealth v. Aponte*, 391 Mass. 494, 509 (1984). The term 'Hispanic' may refer to persons with various national origins, such as Puerto Rican, Mexican, Cuban, and Spanish. *Id.* at 495, n.3." *Commonwealth v. De La Cruz*, 405 Mass. 269, 272 (1989).

*La Cruz, supra* at 274, without first conducting a colloquy with the defendant.

6. *Testimony pursuant to plea agreement.* Carmen Mangual testified pursuant to a plea agreement providing for dismissal of the charges against her in exchange for her testimony in the trials of the defendant and his two companions. The agreement was admitted in evidence without objection. It incorporated by reference the latter two statements of several that Mangual made to the police after her arrest and provided specifically as follows. "If [Mangual] testifies, when requested, at the trials . . . *in accordance with the aforementioned statements* . . . the Commonwealth will assent to the dismissal of [Mangual's] case at the conclusion of all of the above mentioned three (3) cases" (emphasis supplied.) Relying on *People* v. *Medina*, 41 Cal. App. 3d 438, 452-456 (1974), the defendant asserts that it was error to admit Mangual's testimony, because her plea agreement lacked a clause requiring that she testify truthfully and instead required that she testify in a particular fashion.[18] See *id.* The defendant did not object to Mangual's testimony. Accordingly, we confine our inquiry to whether the admission of Mangual's testimony created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990); G. L. c. 278, § 33E.

"The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa* v. *United States*, 385 U.S. 293, 311 (1966). Accord *Commonwealth* v. *Johnson*, 372 Mass. 185, 190 (1977). These "established safe-

---

[18]There is no suggestion that the prosecutor thought that the material portions of the statements incorporated in the plea agreement were false or that the prosecution knowingly offered false testimony. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice' [citations omitted]. . . . When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio* v. *United States*, 405 U.S. 150, 153-154 (1972).

guards" operated properly in this case. The defendant vigorously cross-examined Mangual in a way that illuminated her incentives to please the prosecution. Defense counsel asked her, "[Y]our understanding is that . . . if you testified *in accordance with some statements*, the charges against you are going to be dismissed?" Mangual replied affirmatively. Counsel returned to this point twice, asking her, "[i]f you get the job done here today, [the charges] are all going to go away?" and "the charges are just going to go poof?" Mangual replied affirmatively to both of these questions. Counsel also elicited the admission that her initial statements to the police were "a lot of lies," but that, after she changed her story so that the police "were satisfied" with it, the questioning ceased and she was taken to protective custody in a motel. In his summation, defense counsel hammered away at the witness's legal problems, her self-interest, the deal she made for herself, her lies, her various versions of what occurred, and the benefits she received from the Commonwealth for her testimony. The judge, in the course of charging on credibility, reminded the jurors that they should consider "the motivation of witnesses in testifying; any rewards or inducements that may have been made to them." The instruction alerted jurors to their obligation to consider Mangual's motives for testifying as she did. The plea agreement also was in evidence, so that the jury could examine it and make inferences about the reliability of testimony based on it. Accordingly, we conclude that there was no substantial likelihood of miscarriage of justice. See *Yesilciman, supra* at 746; G. L. c. 278, § 33E.

We note that the Federal courts, while not considering the status of plea agreements requiring testimony conforming to particular prior statements, have approved contingent plea agreements, which pose some of the same difficulties.[19] See *United States* v. *Dailey*, 759 F.2d 192 (1st Cir. 1985) (con-

---

[19]A contingent plea agreement is one in which benefits to the witness are made contingent on the success of the prosecution of the confederates of the accomplice.

tingent plea agreements are not so likely to induce perjury that they would violate due process, as long as the jury is informed of the nature of the agreement, defense counsel cross-examines, and the jury is properly instructed). See also *United States* v. *Yarbrough*, 852 F.2d 1522, 1538 (9th Cir. 1988), cert. denied, 490 U.S. 1010 (1989), and cases cited.

Our recent decision in *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989), does not affect our view that the agreement in this case did not create a substantial likelihood of a miscarriage of justice. In *Ciampa*, we addressed the problem of agreements in which the Commonwealth promises a sentencing recommendation in exchange for truthful testimony. One of the most prejudicial flaws of the agreement introduced in *Ciampa* was its repeated self-serving references to the witness's obligation to testify truthfully. We held that such references may impair a jury's ability to assess the witness's credibility, because the jurors may believe that, due to "the agreement's truthfulness requirement, the Commonwealth knows or can discover whether the witness is telling the truth." *Id.* at 260, citing *United States* v. *Wallace*, 848 F.2d 1464, 1474 (9th Cir. 1988). The agreement in this case suffers from no such flaw. Indeed, the defendant objects to the plea agreement in this case because it lacks the very feature we considered so damaging in *Ciampa*. We add, however, that in the future, plea agreements should be drafted so as to make the obligation to testify truthfully clear to the witness, and these agreements should be handled as we directed in *Ciampa*. Proper drafting will avoid any suggestion of taint or suspicion of perjury, while proper handling will prevent impermissible bolstering of the witness's credibility.

7. *Relief pursuant to G. L. c. 278, § 33E.* Our review of the entire record reveals no facts warranting a new trial or entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*